Filed 9/5/14  (unmodified opn. and cert. order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.M., | B242123 |
|     Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BF037073) |
|     v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| G.H., | |
|     Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 29, 2014, be modified as follows:

1.  The sentence commencing at the bottom of page 4 with "Although G. smoked" and ending with "of the child" is deleted.

2.  On page 8, the first full paragraph, beginning "No findings under" is deleted and the following paragraph is inserted in its place:

"No findings on all eight factors under section 3048, subdivision (b)(1) were required given the trial court's finding that there were no facts indicating a risk of abduction."

There is no change in the judgment.

The petition for rehearing is denied.

CERTIFIED FOR PUBLICATION.

_____

JOHNSON, Acting P. J.                    WILEY, J.*

_____

Filed 7/29/14  Unmodified opinion

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.M.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>G.H.,<br><br>    Defendant and Respondent. | B242123<br><br>(Los Angeles County<br>Super. Ct. No. BF037073) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert A. Schnider, Judge.  Affirmed.

Cuneo & Hoover, Sarah J. Hoover; Law Offices of Robert S. Gerstein and Robert S. Gerstein for Plaintiff and Appellant.

Honey Kessler Amado and Kristin L. Smith for Defendant and Respondent.

_____

J.M. appeals from a judgment on reserved issues granting joint physical custody of his son Joey to J.M. and G.H., Joey's mother, and allowing her to take Joey with her to live in Israel during the school year. Finding no abuse of discretion, we affirm.

## BACKGROUND

We use the parties' first names to simplify and humanize our opinion in this intensely contested custody case. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475, fn. 1.)

J.M. (Jonathan) and G.H., an Israeli citizen, met in 1996 and soon were living together. They never married. When G. gave birth to Joey in September 2005, Jonathan signed a voluntary declaration of paternity and the birth certificate. The couple separated in late 2007, when Joey was two, and Jonathan moved into another house in the summer of 2008, while G. and Joey were in Israel visiting G.'s family. In July 2008 Jonathan married Michelle H., and lives with her and her son, his stepson Ryan. Before Michelle H., Jonathan had been married to three other women, and Jonathan has three adult children from two of those earlier marriages.

In July 2009, when Joey was nearly four, Jonathan filed a petition to establish his paternity of Joey, requesting joint legal and physical custody and reasonable visitation. In October 2009, he filed an order to show cause requesting sole legal custody and shared physical custody (with primary custody to him), after G. and Joey returned from a summer 2009 trip to Israel three weeks after the agreed-upon date of September 3, 2009. In response, G. requested sole legal and physical custody of Joey, with the right to move to Israel with Joey, and reasonable visitation for Jonathan in the United States and Israel. She represented that her visa to remain in the United States was set to expire in November 2010.

After hearing in March 2010, the trial court granted the paternity petition as to status only, reserving all other issues. The parties agree that a June 2010 interim order divided physical custody equally. Appellant's appendix (Jonathan's) contains an unsigned (and explicitly temporary) custody order proposed by G. In June 2011, the

parties stipulated to the appointment of a privately compensated temporary judge for all purposes.

On March 2, 2012, after 12 days of trial, the trial court issued a 29-page amended statement of decision on the bifurcated issues, making factual findings, awarding Jonathan and G. joint legal and physical custody of Joey, and allowing G. to relocate to Israel with Joey during the school year. Joey was to live with Jonathan during most of the summer and longer school holidays, as well as during visits in Israel.

The court acknowledged that Jonathan and G. shared custody equally, both were competent parents, and Joey was well bonded to both. Two parents living in the same location would be ideal for Joey, but as G. had indicated her intent to relocate, the standard was Joey's best interest under those circumstances. "[S]o long as the court does not find that the party intending to move is moving in bad faith, instead of assessing what would be the very best circumstances for the child, the court must determine how the child's interest will best be served by that living arrangement which causes him the least detriment after one parent moves away." Based on the evidence, including an expert child custody evaluation by Dr. Anthony Aloia and the testimony at trial, both Jonathan and G. were "fully adequate to care for [Joey's] organizational, educational[,] social, emotional, physical and moral needs," so "the tipping factor becomes comparing the level of detriment the child will suffer under each scenario."

Gal had returned late from Israel with Joey after the summer of 2009 because G.'s father was diagnosed with cancer, and she wished to stay with her family until tests were completed. While the court found this "entirely reasonable," it noted that G. could also have accommodated Jonathan's offer to fly to Israel and bring Joey back. G. showed "a sense of ownership of the child on her part and her determination to do things the way she chose rather than acting more cooperatively." Nevertheless, this did not damage Joey. Further, there was no showing that G. would not comply with future orders, as she did return with Joey after her family obligations were met and allowed Jonathan immediate time with Joey, and had always returned with the child each time they had traveled to Israel.

3

The court also found that as soon as the parties separated in late 2007, G. expressed her desire to return to Israel and her family to raise Joey. Still, Jonathan paid for a lawyer to help G. get a green card and permanent resident status in the United States. When the support she received from Jonathan fell below what she considered adequate, she decided to return to Israel and stopped her efforts. G.'s current immigration status requires her to leave the United States when the custody case is concluded.

The court found that G. was not negligent in abandoning her immigration claim, because "the claim itself was probably based on false contentions." G. admitted that she had falsely stated that she attended Tel Aviv University and had been a captain in the Israeli army (although she did serve). As her qualifying work was with one of Jonathan's companies, he would be in a position to disclose the misrepresentations, and would use that power to control her. G. simply did not wish to remain in the United States as a permanent resident, and had good faith reasons to relocate to a country where she could obtain employment independent of Jonathan, be near her family for emotional and financial support, and find a better environment to raise Joey.

The court found a variety of events (including the false statements on the visa application) showed G.'s "situational ethics and [that she] will deviate from truth if it is in her interest." G. had taken prizes that she had not won at a charity picnic, and encouraged Joey to say he was six to get on a ride at Legoland when he was a few months shy of that age. None of these events, however, was directly related to her parenting. Joey, who had been primarily raised by G., had been troubled by lying about his age, which showed that he had internalized a positive value system.

An earlier order had required G. and Jonathan to use a website (Ourfamilywizard.com) to communicate about Joey. While G. used the website less than Jonathan and often did not respond to his frequent and detailed emails, the court found "generally credible that the email system was simply too difficult for her in the way it was established," given her dyslexia and ADHD (established by an expert's declaration). Although G. smoked, there was no evidence that she did so in the presence of the child.

4

The parties' tendency to "engage in mutual verbal combat" was not inflicted on or shared with Joey. G.'s and Michelle's mutual animosity showed no alienation of Joey or attempts to interfere with each other's relationship with him.

Jonathan also intended to move away from his house in Beverly Hills (to Santa Barbara, La Jolla, or Carmel), which diminished his ability to provide stability in physical surroundings. Whichever parent Joey lived with, Joey would experience a new home, school, and friends. A move to Israel would reduce his time with his stepbrother Ryan, and the court weighed that detriment against the greater detriment if he were not permitted to relocate to Israel with his mother.

The court found no evidence that G. had mental health or disability issues causing harm to Joey. As to the parties' considerable attempts to raise issues regarding each other's character, Dr. Aloia had testified that Joey was "an exceptional child," and as Joey had spent more time with G., whatever character defects she might have did not produce a negative effect. Dr. Aloia had testified that she was a "good competent and acceptable parent." While G. alleged misbehavior by Jonathan in his interactions with her, no evidence showed that he behaved inappropriately with Joey, and Jonathan was equally acceptable as a parent.

Neither parent would fail to cooperate with court orders. Jonathan would "without hesitation" foster G.'s and Joey's relationship. Although G. had shown some controlling behavior, she also had tried to encourage Jonathan's participation in Joey's life and to share information with Jonathan, and would do so in the future. G. has a tendency to "lie or shave the truth in circumstances that she perceives [to be] to her benefit but that are not generally harmful to others." She was the more controlling in her relationship with Jonathan, and had a sense of dominion over Joey, but the evidence did not show that she tried to alienate Joey from Jonathan, instead consistently showing that she wished to involve Jonathan in Joey's life. "The court does not believe that [Gal] will use her larger timeshare to keep important information from [Jonathan] or attempt to exclude him from the child's life or attempt to alienate the child from him."

5

Joey would suffer detriment from the move "without question," so the court must seek the custody schedule that gives him the least detriment. Significant evidence showed that his connection to G. was stronger. Dr. Aloia had testified that Joey's emotional connection to G. would tip the balance in G.'s favor if he had to choose, and the court had gleaned from undisputed testimony the strength of Joey's relationship with G., supported by G.'s history of providing Joey's primary care.

Joey had already lived in Israel for longer periods of time with G., was fluent in Hebrew and accustomed to the Israeli lifestyle, and the presence there of significant family members was an additional positive factor. Jonathan would not be "'losing custody.'" Although his time-share would decrease, it would still be as much as 25 to 40 percent including visits to Israel, which Jonathan could afford.

"This was obviously a close and difficult case and the basis of the court[']s decision is a somewhat slender reed on which to base such a momentous change. However, change must occur in the life of the child and his parents and whether the scale is tipped heavily or only lightly, the court must rule in the direction where it tips."

The court reviewed and summarized its findings under *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*) and *In re Marriage of Condon* (1998) 62 Cal.App.4th 533 (*Condon*), and provided details of the order for joint legal and physical custody.

The court entered judgment on May 17, 2012. Jonathan filed a motion to set aside and modify the custody order, alleging that he had just discovered that G. had been driving (sometimes with Joey in the car) on a California driver's license that had been suspended on November 26, 2010, following a drunk driving arrest and vehicle impound in October 2010. G. responded that she had been pulled over in October 2010 but there had been no arrest and no charges filed. G. had a valid international license, and she had learned for the first time when she received Jonathan's motion that her California license had been suspended. She immediately went to the Department of Motor Vehicles, which confirmed that there was no case against her and her alcohol level had been well within legal limits, lifted the suspension, and issued her an interim California license.

6

At a hearing in August 2012, G. testified that in October 2010 she had been pulled over and taken to a highway patrol station, where she had been tested and told that her blood alcohol level was very low. She showed the officer a temporary California license, which was returned to her. She had not been given a ticket, or told that her California license would be suspended. The court stated that it believed G. had a valid temporary California license at the time she was stopped, that G. had not been arrested (based on the DMV's setting aside of the suspension), that G.'s description of what occurred when she was stopped was correct, and that although she had been driving on a suspended license (once her California license was suspended, all other licenses were suspended as well), she could reasonably have believed that she had a valid license to drive (as she also believed her Florida and international licenses were valid). Joey's care had not suffered. The court also declined to set aside its judgment based on G.'s failure to advise Jonathan about Joey's ongoing swimming lessons that summer.

In an order filed November 13, 2012, the trial court denied the motion to set aside and to modify. Jonathan filed this timely appeal.

## DISCUSSION

The trial court noted that each party disputed multiple issues and incidents reflecting poorly on the character and parenting ability of the other, most of which were not central to its findings. Similarly, such incidents (which Jonathan continues to discuss) do not control our decision.

## I.   The trial court was not required to make findings under Family Code[1] section 3048.

Jonathan argues that the court failed to make necessary findings regarding whether measures were necessary to prevent G. from abducting Joey. Section 3048, subdivision (b)(1), requires eight such findings in a custody order when "the court becomes aware of facts which may indicate there is a risk of abduction of a child." Jonathan points out that

---

[1] All further statutory references are to the Family Code unless otherwise indicated.

7

the 2010 temporary custody order (by a different judge) states that "because of [Gal's] immigration status, the Court has a responsibility to make a 3048 order," but the temporary order also "makes no finding that there is a risk that [Gal] would violate the court orders." The judge who presided over trial concluded in the 2012 statement of decision that there was no showing that G. was unlikely to comply with future custody orders or was likely to refuse to return Joey to the United States during Jonathan's appointed custody times. G. had traveled to Israel a number of times with Joey and had always returned, and in 2009, when her father was diagnosed with cancer, she returned with no compulsion when her family obligations were satisfied. Nevertheless, the court did require G. to register the judgment with the Israeli court system and to stipulate to continuing jurisdiction of the California court, and ordered that G. (who did not have the financial resources to post a bond) would forfeit all child support if she failed to comply with any court order, as provided under section 3048, subdivisions (b)(2)(B) and (b)(2)(H).

No findings under section 3048, subdivision (b)(1) were required given the trial court's finding that there was no risk that G. would abduct Joey.

## II.     The trial court imposed adequate protective measures.

Jonathan argues that the court imposed "grossly inadequate" protections for international relocation in violation of *Condon*, *supra*, 62 Cal.App.4th 533. *Condon* established that a child's best interest in an international relocation case requires guaranteed enforceability of the California custody order in the foreign country (there, Australia). (*Id.* at p. 547.) The court of appeal concluded that the trial court erred in failing to guarantee enforceability, and on remand the judgment must require a concession to California's continuing jurisdiction, and must create sanctions to enforce that concession: "At a minimum, such sanctions should include the posting of an adequate monetary bond within [the relocating parent's] means and the potential forfeiture of all or some support payments upon proof [the parent] is disregarding essential terms of the court order or has violated the concession of jurisdiction by

8

pursuing modification of the California order in the [foreign country's] courts." (*Id.* at p. 562.)

Here, the order included a requirement that before leaving California for Israel, G. must file a stipulation consenting to California's continuing jurisdiction and further stipulate that she would not file any action seeking modification in any but a California court; she also must file the stipulation in the Israeli courts. G. was further required to register the judgment with the Israeli court system and submit and file proof of such registration. The court found that G. did not have adequate resources to establish a bond. Therefore, the court ordered that 15 days after Jonathan filed a declaration contending that G. violated any custody order, all child support would be deposited into a trust account established and owned by Jonathan with G. as a beneficiary, to be used to pay for the costs of any litigation; anything left over would be paid to G.

Jonathan argues that the absence of a bond is fatal. He does not dispute the court's finding that G. did not have the resources to post a bond, however, and *Condon* refers to a bond *within the relocating parent's means*. (*Condon*, *supra*, 62 Cal.App.4th at p. 562.) Condon also contemplates another possibility, "whether or not the move-away parent has the funds to post a substantial bond," in the form of terminating or reducing child support payments if the custodial parent attempts to frustrate the custody order and the foreign court refuses to enforce it. (*Id.* at p. 548.) Under the circumstances in *Condon* (where the mother had once moved the children to France and had defied a court order by removing the children to Australia without allowing any access to the father), the court of appeal commented that registration of the California custody order with Australia, does not provide "absolute protection." The children were Australian citizens and residents, and had previously resided for long periods of time in Australia. A court would likely consider them "'settled'" there, and so would not make an order requiring their return to California. (*Id.* at pp. 557, 559–560.) In this case, however, the court found that G. could not afford to post a bond, and the circumstances do not show the same risk as in *Condon* that a court would fail to enforce the California order.

9

The trial court's order in *In re Marriage of Abargil* (2003) 106 Cal.App.4th 1294 (*Abargil*) required the mother moving to Israel to register the judgment in the Israeli courts and file her stipulation consenting to the judgment and California's continuing jurisdiction in the Israeli courts. "[T]he judgment had teeth to compel [her] adherence because it required her to post a bond or other surety to ensure her compliance," consistent with *Condon*'s provision that a "court may fashion creative mechanisms such as bond and cut off of financial support to ensure overseas compliance." (*Id.* at p. 1300.) There was no provision for forfeit of support in the event of violation, and the court did not require such a sanction on remand. (*Id.* at pp. 1303–1304.) The court here took the circumstances into account and given that G. could not afford to post a bond, the order imposed a reasonable sanction should she fail to comply with the court's custody order, allowing Jonathan to keep his support payments in trust 15 days after he filed a declaration alleging a violation.

Jonathan also argues that the court should have imposed four additional conditions, none of which he supports with authority. The trial court did not abuse its discretion in declining to go beyond what *Condon* requires.

## III. The custody order was not an abuse of discretion.

We review the custody order for an abuse of discretion, measuring "whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).) No matter the reasoning of the trial court, we must uphold the ruling if it is correct on any basis. (*Ibid.*) We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence. (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 548.) We may reverse if the trial court applied improper criteria or misunderstood the law, as then the court has not properly exercised its discretion. (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)

Jonathan appeals from an initial permanent custody order. "In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.' ( . . . § 3040, subd. (b).) It must look to *all the*

10

*circumstances* bearing on the best interest of the minor child." (*Burgess*, *supra*, 13 Cal.4th at pp. 31–32.) "In addition, in a matter involving immediate or eventual relocation by one or both parents, the trial court must take into account the presumptive right of a custodial parent to change the residence of the minor children, so long as the removal would not be prejudicial to their rights or welfare. ( . . . § 7501 . . . .)" (*Id.* at p. 32.)

The Family Code has no preference or presumption regarding any arrangement for custody and visitation, and "under . . . section 7501, the 'general rule [is that] a parent having child custody is entitled to change residence unless the move is detrimental to the child.'" (Burgess, *supra*, 13 Cal.4th at p. 35.) "A trial court may consider the extent to which the minor children's contact with their noncustodial parent will be impaired by relocating. In so doing, however, it is not restricted to any particular formula for contact or visitation; nor is it required to make a custody determination that preserves the . . . status quo." (*Id.* at p. 36.) "The dispositive issue is, accordingly, *not* whether *relocating* is itself 'essential or expedient' either for the welfare of the custodial parent or the child, but whether a *change in custody* is '"essential or expedient for the welfare of the child."'" (*Id.* at p. 38.) A change is essential or expedient if it is in the child's best interest. (*LaMusga*, *supra*, 32 Cal.4th at p. 1098.)

## A.     The trial court considered Joey's best interest.

Jonathan argues that the trial court applied the wrong standard in making the custody order, neglecting the best interest standard and focusing entirely on the relative detriment to Joey of awarding primary physical custody to G. or to Jonathan. The statement of decision belies that claim. The trial court began by stating that in making the initial permanent custody order, it had the broadest discretion to determine what arrangement would be in Joey's best interest. In the abstract, Joey's best interest would be served if neither G. nor Jonathan were to relocate and if they continued to share custody equally. Given the circumstance of G.'s return to Israel, "the court must base its order on the child's best interest under those circumstances," determining "how the child's interest will best be served by that living arrangement that causes him the least

detriment after one parent moves away." The court also considered the detriment to Joey's relationship with Jonathan's stepson Ryan and stepmother Michelle. Joey was closely bonded to both parents, and "[h]e will suffer detriment from the move without question. Thus, the court order should be for a schedule that gives him the least detriment." Joey's connection to G. was stronger, so "he would suffer more detriment by losing that connection to his mother for the longer period of time."

The court's discussion of detriment does not mean it did not base its order on Joey's best interest. When one parent proposes a move, "it is within the wide discretion of the superior court to order a change in custody based upon such detriment [to the relationship between the child and the noncustodial parent], if such a change is in the best interests of the children in light of all the relevant factors." (*LaMusga*, *supra*, 32 Cal.4th at p. 1095.) In this case, the parents could not continue to share physical custody equally. The court was correct to consider whether Joey's relationship with G. would suffer more detriment if Joey stayed behind while G. moved to Israel, leaving Jonathan with the larger share of physical custody, or if Joey's relationship with Jonathan would suffer more detriment if Joey moved to Israel with G., leaving G. with the larger share of physical custody. Acknowledging that this was a delicate and difficult decision, the court concluded that Joey's closer bond with G. meant that he would suffer a greater detriment if she were the parent with a lesser share of physical custody, and given all the circumstances discussed in the lengthy statement of decision, it was in Joey's best interest to reside primarily with G. in Israel.

The trial court in *F.T. v. L.J.*, *supra*, 194 Cal.App.4th 1 declined to address the question of which custody arrangement would be in the child's best interests, "misunderstanding and/or avoiding the fundamental question before it." (*Id.* at p. 22.) Further, the trial court erroneously required the moving parent to show that the planned relocation was necessary, and focused excessively on the detriment to the child's relationship with the nonmoving parent without considering the detriment to the child's relationship with the relocating parent if the child stayed behind. (*Id.* at p. 23.) The court of appeal found an abuse of discretion for those reasons and others, including that

12

insufficient evidence supported some of the trial court's findings. (*Id.* at p. 25.) *F.T. v. L.J.* does not require us to find an abuse of discretion, as here the trial court understood and applied the proper standard.

### B.     The trial court made the necessary findings.

Under the "heart-wrenching circumstances" in move-away custody cases, the "law is not amenable to inflexible rules." (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.) Our Supreme Court listed eight factors "[a]mong [those] that the court ordinarily should consider" in relocation cases when deciding whether to modify custody. (*Ibid.*)

Jonathan argues that the trial court failed to make a finding regarding Joey's "interest in stability and continuity in the custodial arrangement." (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.) To the contrary, the court considered Joey's interest in a stable arrangement throughout the statement of decision, noting that Jonathan's intent to relocate meant that even in California there would be an effect on the stability of Joey's physical surroundings, and that given Joey's closer bond with G., emotional stability would be best achieved if Joey spent the school year with G. in Israel. Jonathan reargues the evidence, but substantial evidence supports this finding.

We easily reject Jonathan's next argument (that the court failed to make findings regarding "the reasons for the proposed move"). (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.) Citing its own conclusions and Dr. Aloia's findings, the court concluded that G. "has valid good faith reasons for her wish to relocate. She wishes to be near her family in a country where she can obtain employment not associated with [Jonathan], where she will not be as dependent upon [Jonathan], where she can obtain emotional and financial support and where she believes she will find a better environment for raising the child." These findings are based on substantial evidence, and we must remember that there is no dispute that G.'s immigration status requires her to return to Israel when the custody litigation is at an end. The court "*may* consider whether one reason for the move is to lessen the child's contact with the noncustodial parent" (*id.* at p. 1100, italics added), but "in the end the trial court was not persuaded. In its statement of decision, the court

did not find [the moving parent's] motives to be impure. All conflicts in the evidence are drawn in favor of the judgment." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364.)

Jonathan faults the trial court for not finding which parent was most likely to ensure that Joey would have frequent and continuing contact with both parents. This is not a factor in *LaMusga*, *supra*, 32 Cal.4th 1072, but a factor to be considered in whether to grant sole custody to either parent under section 3040 (a)(1), which is not in issue here. Nevertheless, the trial court did conclude that even before court involvement G. had attempted to "include and involve" Jonathan in Joey's life, and she would not use her larger time-share to exclude Jonathan, showing "a willingness to take all necessary and proper steps to maintain [Jonathan's] connection with" Joey. Dr. Aloia initially expressed some concern in his report, but after he reviewed additional information, he testified that he had no serious concerns that G. would not foster a relationship with Jonathan if Joey moved to Israel with G. G.'s difficulties with email were not evidence that she intended not to foster a relationship between Joey and Jonathan.

Jonathan argues that the court did not find compelling circumstances to justify Joey's separation from his stepbrother, Michelle's son Ryan. In a move-away case where the trial court split the parents' four biological children, allowing two to move with the mother while two remained with the father, both parents argued that separating the siblings was an abuse of discretion. (*In re Marriage of Williams* (2001) 88 Cal.App.4th 808, 811–812 (*Williams*).) The court of appeal agreed that the trial court abused its discretion when it "'split the babies'" and made no findings regarding the adverse effect on the children, with no testimony, psychological evaluations, or evidence about the bond between the siblings or how the separation would affect their best interests. (*Id.* at p. 813.) Such a split required the trial court to articulate "compelling circumstances." (*Id.* at pp. 814–815.) Similarly, in a custody dispute after a mother with primary physical custody of two biological brothers moved to another county, the court awarded custody of one brother to the mother and one to the father, with no testimony or evidence regarding the needs of the brothers or their relationship (counsel represented that one brother was autistic, which the father argued had a negative effect on the other child's

14

development).  (*In re Marriage of Heath* (2004) 122 Cal.App.4th 444, 447–448 (*Heath*).)  The court of appeal relied on *Williams* to conclude that where the record was silent as to the "potential detriment of their separation," there was no proof of "compelling circumstances," making it an abuse of discretion to separate the children based on "[s]peculation by lawyers, conflicting argument on behalf of parents, and 'hunches' of judges."  (*Heath*, *supra*, 122 Cal.App.4th at p. 450.)  Detriment also could not be presumed from the alleged disability of one of the brothers.  (*Ibid*.)  The court reversed and ordered separate counsel appointed for each brother.  (*Id.* at p. 452.)  No case has extended the reasoning in *Williams* and *Heath* to stepsiblings.

We decline to apply the "compelling circumstances" requirement to this case.  Ryan, who is four years older than Joey, is not Joey's biological sibling.  We grant Jonathan's request for judicial notice of his adoption of Ryan in October 2013, but this postjudgment alteration in Jonathan's legal relationship with Ryan does not change Joey's relationship with Ryan for the purpose of our analysis.  Joey was born in September 2005.  Jonathan married Michelle in July 2008, when Joey was nearly three and G. had primary physical custody.  Jonathan has had equal physical custody of Joey since June 2010, when Joey was nearly five.

Unlike in *Williams* and *Heath*, there was ample evidence and testimony regarding the boys' relationship.  Dr. Aloia testified at trial that Joey's close relationship with Ryan was very important, and breaking that bond would be a detriment, but was not the primary issue:  "Take Ryan out of this.  He's not a parent."  The bond had strengthened since his initial report 15 months ago and the boys were now "virtually inseparable."  Nevertheless, Dr. Aloia foresaw no difficulty for Joey in resuming that close relationship when he returned to California for Jonathan's portion of custody.  The trial court took the evidence into account in determining Joey's best interest, recognizing that Joey was close to Ryan and the move would reduce their time together, mitigated by Joey's substantial time with Jonathan and the ability to communicate electronically.

Equating the relationship of a stepsibling with whom a child has spent half of his time since the age of five with that between a child and his biological sibling would be

15

inappropriate, and requiring compelling circumstances to separate stepsiblings would affect all cases in which the subject of a custody dispute has a blended family. The court appropriately evaluated the evidence regarding the boys' relationship, and was not required to find compelling circumstances to allow their separation during the time that G. and Joey reside in Israel.

Jonathan points out that the trial court failed to make a specific finding regarding G.'s willingness to put Joey's interests above her own. While this is one of the eight factors in *LaMusga*, *supra*, 32 Cal.4th at p. 1101, *among* those that a trial court ordinarily *should* consider, the absence of a specific finding does not mean that the custody decision was an abuse of discretion.

Finally, Jonathan argues that the trial court failed to determine which parent would be a better moral role model, and that the court failed to determine which parent would "best serve Joey's interest in becoming a well-educated and competent adult." He cites no legal authority requiring those specific findings, and so we do not consider his arguments. (*Abargil*, *supra*, 106 Cal.App.4th at p. 1300.)

## IV. The trial court did not abuse its discretion in refusing to set aside the judgment.

The same abuse of discretion standard applies to our review of the denial of Jonathan's motion to set aside the judgment, with Jonathan bearing the burden to make "'a clear showing of an abuse in the exercise of such discretion.'" (*Roberts v. Roberts* (1966) 245 Cal.App.2d 637, 639.)

Jonathan argues that the trial court "compounded its prior errors" in failing to set aside the judgment based on the new evidence regarding the suspension of G.'s California driver's license. We described above the court's findings, which are based on substantial evidence, that the license had been suspended in error and G. did not know about the suspension. Jonathan has not shown that the denial of the motion to set aside was an abuse of discretion.

16

**DISPOSITION**

The judgment is affirmed.  Costs are awarded to respondent.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


WILEY, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/6/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.M.,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>G.H.,<br><br>     Defendant and Respondent. | B242123<br>(Los Angeles County<br>Super. Ct. No. BF037073)<br><br>CERTIFICATION AND<br>ORDER FOR PUBLICATION |

The opinion in the above-entitled matter filed July 29, 2014, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


CHANEY, Acting P. J.　　　　JOHNSON, J.　　　　WILEY, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.