Filed 5/21/26  S.C. v. S.D. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| S.C., | B343589 |
| Respondent, | (Los Angeles County Super. Ct. No. 23STPT02606) |
| v. | |
| S.D., | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christine J. Gonong, Judge.  Affirmed.

Quinn & Dworakowski and David Dworakowski for Appellant.

Joel S. Seidel for Respondent.

_____

S.D. (Mother) appeals from a family court judgment granting S.C's (Father) petition to determine his parentage over seven-year-old W.D., awarding Father primary physical custody

and granting Father's request to relocate to Oregon. Mother contends the family court abused its discretion in applying the factors for assessing a move-away request set forth by the Supreme Court in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*) and in failing to ensure she had sufficient visitation time with W.D. She also contends the court abused its discretion in ordering her to pay all airfare and accommodation costs for her visits with W.D. Finally, she argues the court violated her right to due process by failing to inform her that a court reporter would not be provided at the short cause trial on Father's petition. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Parental Relationship Petition*

On August 31, 2023 Father filed a petition to determine parental relationship, requesting a determination he was a parent of then-six-year-old W.D. The September 18, 2023 amended petition alleged Mother and W.D. lived in California and Mother voluntarily declared Father's paternity. The petition requested the family court grant Father sole legal and physical custody of W.D. and order drug and alcohol testing for Mother. In a supporting declaration, Father stated W.D. was born in April 2017, lived in Los Angeles with Mother and Father from 2017 to April 2023, lived with Father's parents (W.D.'s paternal grandparents) in Hillsboro, Oregon from April 2023 to August 2023, and was currently living in Los Angeles with Father "some of the time" since August 2023. In her response, Mother admitted Father was the parent of W.D. and requested the court grant her sole legal and physical custody of W.D.

2

B.    *Father's September 2023 Request for Temporary Emergency Orders*

On September 29, 2023 Father filed an ex parte request for temporary emergency orders regarding child custody and visitation.  Father sought sole legal and physical custody of W.D., monitored visitation for Mother, and twice-weekly drug and alcohol testing for Mother.  Father also requested authorization to move W.D. to Oregon to live with Father and W.D.'s paternal grandparents, or in the alternative, to allow W.D. to reside with Father in Los Angeles.

In his supporting declaration, Father averred Mother had a serious alcohol addiction, used marijuana while drinking alcohol, and had neglected W.D.  Over the prior six years, Father often came home to find Mother passed out from drinking or using drugs while W.D. and his 15-year-old half-sister, Ayanah, were left unsupervised.  Father also suspected Mother was "doing sex work."

Father further averred that in April 2023 he and Mother agreed to try to move to Oregon to be near W.D.'s paternal grandparents.  Father had received several job offers in Hillsboro, and his family and friends in the state would provide a reliable support system for W.D.  Further, Father and Mother signed a consent form for paternal grandparents to care for W.D.  From April to August, W.D. stayed with the paternal grandparents, completed kindergarten, and was scheduled to begin first grade in September.  However, after Father met with an attorney to commence his paternity action, Mother and maternal grandfather drove to Oregon and took W.D. from the paternal grandparents.

Father submitted declarations from nine witnesses, three of whom testified at trial. Melinda Eva McDonald, one of the three trial witnesses, was the assistant manager of the apartment complex where the family lived. MacDonald had observed Mother routinely smoke marijuana in front of W.D. and Ayanah, drink alcohol "excessively and regularly for years," and pass out from drinking on "countless occasions." (Capitalization and boldface omitted.) She frequently saw W.D. playing unattended in the apartment complex and had observed Mother slap and pinch him until he cried. Further, Mother told McDonald that she received monthly allowances from men for dates and sex, and McDonald saw random men spend the night at the apartment.

The paternal grandmother, Melissa C., and Mother's close friend Keith Bailey also submitted declarations and testified at trial. Melissa averred that she and the paternal grandfather, Mark C.,[1] cared for W.D. in Oregon from April 24 until August 5, 2024. On May 9 Mother arrived in Hillsboro to stay at their home. Melissa observed Mother appear to be intoxicated on five occasions between May 14 and June 28, sometimes in W.D.'s presence. Mother returned with Father to Los Angeles on July 13. On August 5 Mother came to the grandparents' house without notice and took W.D. away. Bailey averred he had seen Mother on numerous occasions verbally abuse her children, pass out from intoxication, and consume excessive alcohol while caring for her children. Two declarants attested to the stable and loving environment the paternal grandparents provided to W.D. while

---

[1] We refer to Melissa and Mark by their first names to preserve Father's anonymity.

he lived in Oregon, and another declarant (W.D.'s great aunt) attested to Melissa tutoring W.D. in preparation for kindergarten.

On September 29, 2023 Mother, then represented by an attorney, filed an opposition to Father's request for emergency orders. In her supporting declaration, she stated Father had previously hit and verbally abused her, and Father and his parents were alcoholics. When Father abused alcohol, he turned abusive and jealous, and when Mother was not home or did not respond to Father's communications, Father would assume she was engaging in prostitution, which was false. Mother had never abused W.D., and she always left him in the care of Ayanah or a trusted adult if she left for a short time. Mother signed the consent form giving W.D.'s paternal grandparents permission to care for W.D. when an emergency arose; Mother did not intend to consent to any permanent custody or visitation arrangement. Mother left Oregon with W.D. because the environment was "incredibly unhealthy" for them. Since returning to California, she was able to enroll W.D. in school and get him vaccinated, despite Father's opposition to public school and vaccines.

After a hearing on October 17, 2023, the family court confirmed Father's parentage of W.D. but denied his requests for sole legal and physical custody of W.D., monitored visitation for Mother, and drug and alcohol testing for Mother. The court awarded Mother and Father joint legal custody of W.D., with Father having visitation on the first, third, and fifth weekends of each month. Father was permitted to visit Oregon with W.D. The court set the case for trial on April 15, 2024 and ordered the parties to submit trial documents and income and expense declarations.

5

C.     *Father's April 2024 Request for Order*

On April 2, 2024, after the trial date was continued to September 10, Father filed a request for order (RFO) seeking to modify the custody and visitation schedule to allow him visitation during the week.  In his supporting declaration, Father summarized his continuing concerns about Mother's care of W.D. and stated he intended to move to West Los Angeles on May 1, 2024, which was close to W.D.'s school (thereby enabling weekday visitation).  He further averred that he visited Mother and W.D. on Christmas Day 2023 and observed that Mother smelled of alcohol, fell asleep several times during the day, and passed out with W.D. present.

Father attached to his declaration Mother's subpoenaed monthly bank account statements from February 16, 2023 through January 17, 2024 showing payments to convenience and liquor stores and food delivery services, which Father declared Mother used to order alcohol.

Mother filed an opposition to the RFO and submitted a supporting declaration in which she averred that Father harassed and called her repeatedly, frequently showed up to her apartment unannounced, followed her and W.D. around the neighborhood during her custodial time, and told others that she was a prostitute and drug addict.  Mother denied the Christmas Day allegations and denied she consumed alcohol during her parenting time or ordered alcohol when ordering food delivery. Mother stated Father took W.D. to Oregon in early January 2024 without notifying her and had W.D. spend most of his time with a babysitter during Father's custodial time.

6

After a hearing, on May 28, 2024 the family court awarded Mother and Father joint physical custody of W.D., with custody on alternating weeks.

D.    *The Trial and Judgment*

On September 10, 2024 the family court held a one-day, short cause trial.  Mother was then self-represented, and there was no court reporter present.  Mother, Father, McDonald, Melissa, and Bailey testified.  Among the exhibits admitted at trial were Mother's bank statements (the same documents attached to Father's declaration in support of his RFO) and two of Father's job offers for work in Oregon.[2]

The family court filed a seven-page minute order with its findings on September 10, 2024, at the conclusion of the trial. The court stated it found, after considering the testimony, witnesses' demeanor, conduct, and facial expressions, and evidence admitted at trial that Father and the third-party witnesses were credible and Mother was not.  Further, the third-party witnesses corroborated each other's testimony, and their testimony was supported by admissible documentary evidence. The court stated Father's concerns over Mother's fitness to care for W.D. were supported by the evidence, finding that Mother regularly consumed alcohol and had a habit of using marijuana while caring for W.D.  On certain occasions, she passed out after

---

[2]    Pursuant to the family court's order, Father filed an income and expense declaration prior to the trial date;  Mother did not. Father lodged with this court in response to our request copies of the 10 exhibits admitted at trial.  On our own motion, we augment the record to include the exhibits.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

drinking and getting high, slapped W.D., left him unattended, and engaged in sexual relations with men in exchange for money.

The family court awarded the parents joint legal custody with Father having tie-breaking authority. The court ordered that Father could add his name to W.D.'s birth certificate. The court acknowledged that prior to trial, the parents had 50/50 custody, but it awarded Father "primary" physical custody with W.D. living "primarily" with Father. The court ordered that Mother would have visitation during spring and Thanksgiving breaks in even-numbered years, half of W.D.'s winter breaks, and alternating two-week periods during the summer break, with Mother having the first two weeks. The court authorized Father to move with W.D. to Hillsboro, Oregon after October 10, 2024, and it ordered Mother "to pay all costs of airfare and accommodation associated with her visitation."

The family court weighed the factors set forth in *LaMusga, supra*, 32 Cal.4th 1072, and the court found it was in W.D.'s best interest to reside with Father in Oregon. The court found with respect to factor 1 (child's interest in stability and continuity) that W.D. had lived in Oregon with his parents and paternal grandparents, and Mother conceded he had made friends there. Although there was a risk W.D. would miss Mother if he moved, Mother would have "significant visitation time" if she chose to exercise it. There was also a risk of instability if W.D. remained in Los Angeles given Mother's alcohol abuse and habitual use of marijuana, which caused her to provide inadequate care for W.D.

The family court found as to factor 2 (distance of the move) that the distance between Los Angeles and Oregon (requiring an approximately two-and-a-half-hour flight) meant that Mother would not be involved in W.D.'s daily life. Further, W.D. was

seven years old (factor 3, age of child), which was old enough to make it unlikely that he would forget the importance of his relationship with Mother if she maintained it.  For factors 4 and 5 (child's relationship with both parents and the relationship between the parents), the court found W.D. had a good relationship with both parents, and Mother and Father appeared to have a good relationship and would be able to co-parent following Father's relocation.

The family court did not accord any weight to W.D.'s wishes (factor 6) due to his "lack of maturity."  With respect to factor 7 (reasons for the proposed move), Father had job offers in Oregon, and Father believed it was in W.D.'s best interest to be in Oregon because his paternal grandparents could help raise W.D. with a "strong community to support."  The court noted as to factor 8 (extent to which the parents currently are sharing custody) that Mother and Father had "50/50" custody before trial, but Mother would have "significant visitation time" with W.D. after trial with Father maintaining primary physical custody.

On November 27, 2024 the family court entered a judgment of parentage recognizing Father's paternity and adopting by incorporation its findings and custody orders set forth in the September 10 minute order.

Mother timely appealed.

**DISCUSSION**

A.     *Governing Law and Standard of Review*

"In an initial custody determination, a parent seeking to relocate with the minor children bears no burden of establishing that the move is 'necessary.'  The trial court must . . . consider, among other factors, the effects of relocation on the 'best interest' of the minor children, including the health, safety, and welfare of the children and the nature and amount of contact with both parents."  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 34 (*Burgess*), citing Fam. Code, § 3011, subd. (a) & former subd. (c).)[3] "[T]he trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.'"  (*Burgess*, at p. 31; accord, § 3040, former subd. (b).)  This standard applies even where, as here, the initial permanent custody order and contemplated relocation modify a temporary joint custody arrangement.  (See *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124 ["Where . . . a parent who shares joint custody of a minor makes a request to relocate the child in the context of an initial custody determination, the trial court must decide de novo what physical custody arrangement would be in the child's best interests."]; accord, *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 20-21 (*F.T.*); see *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 363 ["The joint custody moving parent does not have the presumptive

---

[3]     Further undesignated statutory references are to the Family Code.  In 1996, section 3011, former section (c), included as a factor to consider, "[t]he nature and amount of contact with both parents."  That factor is now found in section 3011, subdivision (a)(3).

right to change the child's residence, and bears no burden of proving the move is essential or imperative."].)

The Supreme Court in *LaMusga* identified a non-exhaustive list of eight factors "that the [family] court ordinarily should consider when deciding whether to modify a custody order in light of . . . [a] parent's proposal to change the residence of the child":  "[1] the children's interest in stability and continuity in the custodial arrangement; [2] the distance of the move; [3] the age of the children; [4] the children's relationship with both parents; [5] the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; [6] the wishes of the children if they are mature enough for such an inquiry to be appropriate; [7] the reasons for the proposed move; and [8] the extent to which the parents currently are sharing custody." (*LaMusga, supra*, 32 Cal.4th at p. 1101.)  Although *LaMusga* involved a postjudgment request for custody modification, the same factors apply to consideration of a child's relocation as part of an initial permanent custody order.  (See *J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935, 937 [affirming family court's application of the *LaMusga* factors where it issued an initial permanent custody order and granted relocation]; *F.T., supra*, 194 Cal.App.4th at pp. 20-24 [holding family court did not apply *LaMusga* factors correctly to determine child's best interests in move-away case as part of initial custody determination].)

"We review orders granting or denying move-away requests for abuse of discretion." (*Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, 1598-1599; see *Burgess, supra*, 13 Cal.4th at p. 32 ["The standard of appellate review of custody and visitation orders is

11

the deferential abuse of discretion test."].) "Generally, a trial court abuses its discretion if there is no reasonable basis on which the court could conclude its decision advanced the best interests of the child." (*Jacob A.*, at p. 1599.) A court also abuses its discretion "'by applying improper criteria or by making incorrect legal assumptions.'" (*In re Marriage of C.T. & R.B.* (2019) 33 Cal.App.5th 87, 97; accord, *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 901.) Ultimately, "[t]he test is not whether [the reviewing court] would have made the same order or whether the trial court could have reasonably made some other order, but 'whether the trial court could reasonably have concluded that the order in question advanced the "best interest" of the child.'" (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595; accord, *Burgess*, at p. 32 ["The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child."].)

B.    *The Family Court Did Not Abuse Its Discretion in Finding Relocation to Oregon Was in W.D.'s Best Interest*

Mother contends the family court misapplied the holding in *LaMusga* by failing to justify its decision with specific findings, failing to preserve substantial visitation time for her, and failing to consider alternative visitation arrangements. Mother's contentions lack merit.

The September 10, 2024 minute order reflects that the family court considered all eight *LaMusga* factors, made specific findings on each factor, and, after weighing those factors, concluded it was in W.D.'s best interest to reside with Father in Oregon, notwithstanding that relocation would limit Mother's involvement in W.D.'s daily life. Most significantly, the court

12

made findings that W.D. would likely face instability if he remained with Mother because her alcohol and marijuana use caused her to provide inadequate care for W.D. (factor 1); Father and Mother would be able to co-parent after the relocation based on their good relationship (factor 5); and W.D.'s paternal grandparents had a strong community in Oregon to support him (factor 7). The court further found the testimony of Father and the third-party witnesses was credible, and Mother's testimony was not. Absent an evidentiary showing to the contrary, we presume these findings are correct. (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125 ["One of the presumptions [indulged on appellate review] is that the record has sufficient evidence to sustain the trial court's findings of fact."], citing *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) Mother has not shown the court abused its discretion.[4]

With respect to Mother's visitation time, her principal contention is that the family court abused its discretion by failing to provide her meaningful time with W.D. (arguing her custodial share was reduced to 15 percent), and that her holiday-based

---

[4]      Mother relies on *In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947 to support her contention the family court failed to provide "specific, evidence-based reasoning for its decision." The Supreme Court in *Brown* stated that for purposes of an initial custody determination, the court must set the matter for an adversarial hearing (as it did here) and "consider[] all relevant factors." (*Id.* at pp. 955-956.) Nothing in *Brown* suggests the court must conduct a more refined analysis than the one the family court provided here in applying the *LaMusga* factors. Nor did the *LaMusga* court impose such a requirement, stating only that "court[s] ordinarily should consider" the enumerated factors. (*LaMusga, supra*, 32 Cal.4th at p. 1101.)

visitation schedule was not, as described by the court, "significant visitation time." Mother bases her argument on cases defining what constitutes "significant" custodial time where the parents have joint physical custody, but in this case, the court's order in effect awarded Father sole physical custody, with visitation for Mother.[5] The court had broad discretion to order such a custody and visitation arrangement. In addressing a relocation request, the court is "not restricted to any particular formula for contact or visitation; nor [is it] required to make a custody determination that preserves the . . . status quo." (*Burgess, supra*, 13 Cal.4th at p. 36.) Although "'frequent interaction with both parents' . . . is the ideal . . . , when one of the parents has stated an intent to relocate out of state, such a result is no longer possible," and the court "must then navigate the delta between the ideal and the reality." (*Jacob A. v. C.H., supra*, 196 Cal.App.4th at p. 1601; see *F.T., supra*, 194 Cal.App.4th at p. 22 ["'[t]he question for the trial court is not whether the parent may be *permitted* to move; the question is what arrangement for custody should be made [if and when the custodial parent moves]'"].)

Here, in light of the family court's findings, the court had a reasonable basis to grant sole physical custody to Father with an alternating holiday-based visitation schedule for Mother. As discussed, the court found that Mother's substance use caused

---

[5]      As Mother acknowledges,although the family court awarded Father primary physical custody, a common description of custody, "the term 'primary physical custody' has no legal meaning." (*In re Marriage of Richardson* (2002) 102 Cal.App.4th 941, 945, fn. 2.) Rather, under the Family Code a parent may be awarded either joint physical custody (§ 3004) or sole physical custody (§ 3007). (See *Richardson*, at p. 945, fn. 2.)

her to provide inadequate care for W.D.; she on occasion passed out after drinking; she slapped W.D.; she left him unattended; and she engaged in sexual relations with men in exchange for money, sometimes bringing the men into the apartment she shared with W.D.  The court further found that remaining in Los Angeles with Mother would likely expose W.D. to "instability"; a strong community of support existed for W.D. in Oregon; W.D. had friends there; and his paternal grandparents were there to help raise him.  Accordingly, it was reasonable for the court to conclude that awarding Father sole physical custody of W.D. in Oregon with holiday-based visitation for Mother was in W.D.'s best interest to ensure he received stable parental care and familial support.  (See *J.M. v. G.H., supra*, 228 Cal.App.4th 925 at pp. 930, 936 [affirming order allowing mother to relocate to Israel with child living with mother during school year and with father for most of summer and longer school holidays (and father's trips to Israel) given mother's stronger attachment despite prior equally shared custody and fact that father was "well bonded" with child]; *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 432, 436 [affirming order allowing Mother to move to Tennessee, with nonrelocating father having visitation one week per month or every other month during the school year and eight weeks over the summer, finding schedule "provided for substantial contact"].)

Mother also argues the family court's treatment of the *LaMusga* factors was "superficial and internally contradictory" because it acknowledged W.D.'s good relationship with Mother, Mother and Father's ability to communicate, and W.D.'s ties to both California and Oregon, all of which supported a more favorable visitation arrangement for Mother.  However, the court

15

had broad discretion to attach greater significance to other *LaMusga* factors that supported W.D.'s move to Oregon (including increased stability and support for W.D.), even if the move reduced Mother's custodial timeshare and visitation. (See *LaMusga, supra*, 32 Cal.4th at p. 1093 ["The weight to be accorded to such factors must be left to the court's sound discretion."]; *In re Marriage of Edlund & Hales* (1998) 66 Cal.App.4th 1454, 1473-1474 [trial court did not abuse its discretion in focusing on moving parent's bond, her ability to care for child, and nonmoving parent's inadequate care for child despite evidence that child would suffer some detriment from relocation].)

Moreover, Mother misapprehends the significance of Father's ability to communicate with Mother, which weighed in favor of rather than against relocation. (See *LaMusga, supra*, 32 Cal.4th at p. 1095 [if there were "a history of cooperative parenting. . . . it might have appeared more likely that the detrimental effects of the proposed move . . . could have been ameliorated"]; *In re Marriage of Abargil* (2003) 106 Cal.App.4th 1294, 1299 [because mother respected child's relationship with father and "was likely to foster continuing contact between them," this met minimum requirement for international relocation by showing there would be continuing contact between child and remaining parent].)

Finally, Mother contends the family court failed to preserve W.D.'s relationship with both parents to the greatest extent possible and to consider alternative arrangements for visitation, such as phone calls and virtual contact. But Mother cites no authority for the proposition that courts are required to consider alternative visitation arrangements before granting a relocation

16

request, and she fails to provide any evidence that she requested alternative arrangements or the court failed to consider them.

C.  *The Family Court Did Not Abuse Its Discretion in Ordering Mother To Pay All Travel Costs Associated with Her Visitation*

Mother contends the family court abused its discretion in ordering her to pay for all airfare and accommodations associated with her visits with W.D. without finding she had the ability to pay the costs.  However, Mother has not shown that the court failed to consider her financial circumstances, that she objected to payment of her own visitation costs, or that she lacked the ability to pay for the travel.  As discussed, Mother did not submit an income and expense declaration before trial, despite an order to do so.  Nor has she pointed to anything in the record showing her inability to pay.[6]  She also did not have a fee waiver in the family court or on appeal.

Moreover, Mother has cited no authority for her contention that a family court must make an ability-to-pay finding before ordering that the nonmoving parent pay for her own costs in visiting the child.  *A.P. v. K.T.* (2023) 89 Cal.App.5th 988, relied on by Mother, is inapposite.  *A.P.* addressed the insufficiency of a family court's ability-to-pay finding in the context of an order requiring a mother to pay expenses associated with a court-ordered child custody evaluation.  (*Id.* at p. 1002.)  As *A.P.*

---

[6]  We note the bank statements admitted at trial showed monthly deposits during 2023 ranging from $1,700 to $4,700.  Mother does not contend the financial statements show her inability to pay costs, nor do they support that contention in the absence of an income and expense declaration.

recognized, section 3112 requires the family court to inquire into the parents' financial condition before allocating the costs of the evaluation between the parties.  (*A.P.*, at p. 1002.)  There is no analogous provision in the Family Code that requires the court to consider a parent's ability to pay visitation costs.

D.    *The Lack of a Reporter's Transcript Did Not Violate Mother's Due Process Rights*

Mother contends the family court violated her due process rights by not informing her that if she wanted a court reporter to be present at the September 10, 2024 trial, she needed to request or retain one.  As a threshold matter, we cannot tell from the record whether the court advised Mother that there would not be a court reporter at the trial.  Nor has Mother shown that any failure to advise her would have violated her right to due process.  Moreover, Mother did not request a court reporter on the day of trial after it became clear there was no court reporter who would be transcribing the trial, nor did she request a continuance so she could retain one.

*Jameson v. Desta* (2018) 5 Cal.5th 594, relied on by Mother, does not assist her.  The Supreme Court in *Jameson* held that when a superior court adopts a general policy of not providing court reporters in most civil cases but allowing private parties who have the financial means to retain a private court reporter, "an official court reporter, or other valid means to create an official verbatim record for purposes of appeal, must generally be made available to in forma pauperis litigants upon request."  (*Id.* at p. 599.)  But as Mother concedes, she was not an indigent litigant, and she did not request a court reporter.  Mother's reliance on California Rules of Court, rule 2.956(c)(2) fares no

better.  That rule likewise provides that, upon request, "[t]he court must provide an official reporter if the party has been granted a fee waiver and if the court is not electronically recording the hearing or trial."[7]  As stated, Mother did not have a fee waiver in the family court (or on appeal).

Mother is correct that a verbatim record of a superior court proceeding is often critical to success on appeal.  As the Supreme Court explained in *Jameson v. Desta, supra*, 5 Cal.5th at pages 608 to 609, "the absence of a court reporter at trial court proceedings and the resulting lack of a verbatim record of such proceedings will frequently be fatal to a litigant's ability to have his or her claims of trial court error resolved on the merits by an

---

[7]     As the *Jameson* court observed, Government Code section 68086, subdivision (d), "directs the Judicial Council to adopt rules to ensure that parties are given adequate and timely notice of the availability of an official court reporter."  (*Jameson v. Desta, supra*, 5 Cal.5th at pp. 612-613.)  The Judicial Council adopted California Rules of Court, rule 2.956 in response to the Government Code's directive.  (See *Jameson*, at p. 613).  Rule 2.956(b)(3) provides with respect to superior courts that do not normally provide official court reporters for civil trials (like the Los Angeles Superior Court), "[T]he court must require that each party file a statement before the trial date indicating whether the party requests the presence of an official court reporter.  If a party requests the presence of an official court reporter and it appears that none will be available, the clerk must notify the party of that fact as soon as possible before the trial."  The record does not reflect whether the family court required the parties to file a statement before the trial date requesting a court reporter or whether Mother filed such a statement.  And, as discussed, Mother did not request a court reporter.

19

appellate court.  This is so because it is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment."

But that does not mean Mother did not have the ability to retain a certified shorthand reporter to serve as the official pro tempore reporter in the courtroom.  (See Cal. Rules of Court, rule 2.956(c)(1)).  In addition, Mother had the option to prepare an agreed statement or settled statement under California Rules of Court, rules 8.134 and 8.137, but she failed to do so.  These options are not a complete substitute for a verbatim transcript, but Mother could have included facts that were essential to her case on appeal, including, for example, recounting any testimony that supported Mother's position or evidence that showed Mother's inability to pay the costs for transportation.  Mother did not employ any of these techniques to protect her appellate rights.  The fact that Mother was self-represented at the trial did not shift the burden of ensuring an adequate record:  Although we recognize that a party who is self-represented has a more limited understanding of the rules of court than an experienced attorney, "mere self-representation is not a ground for exceptionally lenient treatment."  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984.)

## DISPOSITION

The judgment is affirmed.  Father is to recover his costs on appeal.


FEUER, J.

We concur:


MARTINEZ, P. J.


GIZA, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21