Filed 1/29/16  Marriage of Pablo CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of ERNEST PABLO and SHANNON PABLO. <br> _____ <br><br> ERNEST PABLO, <br><br>    Respondent, <br><br>    v. <br><br> SHANNON PABLO, <br><br>    Appellant. | B260727 <br><br> (Los Angeles County <br> Super. Ct. No. BD511144) |

APPEAL from an order of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed.

Law Office of Jennifer S.F. Lim and Jennifer S.F. Lim for Appellant.

Castellanos & Pelayo-Garcia and Beatriz A. Pelayo-Garcia for Respondent.

_____

Appellant Shannon Pablo (mother) and respondent Ernest Pablo (father) are former spouses and the parents of E., born in October 2007. Mother and father separated in 2008, after a marriage of less than three years.

Mother appeals from a post-judgment order denying her request for joint legal and physical custody of E. We find no abuse of discretion, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Initial Custody and Visitation Orders

Mother and father separated in 2008 and divorced in 2012. The judgment of dissolution of marriage, entered January 4, 2012, granted mother and father joint legal and physical custody of E., with the award of joint physical custody to mother expressly made "dependent on the condition that [mother] attend six (6) anger management classes and submit proof of same to the court."

In July 2012, mother and father stipulated to modify the custody order. They agreed that mother would have custody of E. every other weekend, plus one weeknight every other week. They also agreed that father would have the "tie-breaking vote" for all non-educational, joint legal decisions, and that all exchanges of E. would occur at the Fullerton Police Department.[1]

Mother's custody and visitation rights were further reduced on October 1, 2012. The court granted father sole legal and physical custody of E., and reduced mother's visitation to six hours of monitored visits each week.

### II.

### March 13, 2013 Hearing

On March 13, 2013, mother and father participated in a custody evaluation conducted by court-appointed Marriage and Family Therapist Sharis Peters (evaluator).

---

[1] The stipulation apparently followed testimony in the trial court that mother acted inappropriately at a police station during transfers of E., disrupted school operations, and assaulted father's parents.

2

That same day, the evaluator testified about her findings and recommendations as follows.

Father believed it was in E.'s best interests that he continue to have sole legal custody. Father noted that E. had begun attending public kindergarten for two hours per day several months earlier, and by the time of the hearing had progressed to three-and-a-half hours per day. E. was participating in behavioral modification programs through school, meeting with a school psychologist once per week, and meeting with a private psychiatrist once per month. E. had begun taking medication to reduce his aggression, and father had modified his work schedule so he could take E. to school each day and spend time in class, as requested by the psychologist or the teacher.

With regard to physical custody, father requested a "step-up" plan over the long term, with the eventual goal of resuming shared legal and physical custody. Father told the evaluator that E.'s monitored visits with mother were positive, and he requested that the monitor be eliminated. Father was opposed to increasing the amount of mother's visitation, however, because he felt that E. was making progress with his behavioral issues and father did not want to upset that progress by making changes too quickly. Father was also concerned that mother continued to expose E. to angry outbursts, which were upsetting to him. Finally, father noted that he and mother continued to have a high level of discord between them, and he asked that mother have a psychiatric evaluation before any changes were made to the custody arrangements.

Mother requested that she be granted primary physical custody of E., and that E. be reenrolled at a school near her home. She expressed concerns that father and his parents did not like her and said negative things about her to E. She also believed that father was interfering with her phone calls with E.

The evaluator recommended that father continue to have sole legal custody "until . . . there have been some resolutions in this case." She noted that the interactions between mother and E. were positive and loving, and that mother was very appropriate with E. when he acted out. The evaluator noted, however, that E. was "very new in his therapeutic interventions," and she did not want to delay or disrupt them. The evaluator

3

further was concerned that mother appeared "[unable] to separate her concerns and the way they impact *her* from her concerns about the child and the way things impact *him*." (Italics added.) The evaluator explained: "That concern came to light for me because in talking with mom about the child and about her concerns about him, she often spoke about . . . them from the perspective of herself. And I'm concerned about how much she can separate out those two issues."

Based on the foregoing, the evaluator recommended no change in the custodial plan. She urged that mother "become involved in [E.'s] therapeutic interventions in some regard" and complete a psychiatric assessment to assess, among other things, anger management issues, impulse control, interpersonal dynamics, and mother's ability to co-parent. The evaluator also recommended that mother's visits with E. continue to be monitored. She explained that she could not determine whether mother was able to control her impulsiveness, and that mother continued not to take responsibility for an altercation with the paternal grandparents and E.'s expulsion from preschool. According to the evaluator, "It's almost as if those things happened *to* her instead of her being an active participant in both of those things." (Italics added.) Finally, the evaluator recommended a follow-up evaluation and status review by the court.

In adopting the evaluator's recommendations, the court observed: "The report of the evaluator about [E.'s] physical interaction with [mother] is quite poignant and moving. And I have no doubt that [mother] loves [E.] very much. The evidence the court has received on more than one hearing has been more with [mother's] interaction not with the child, but with other adults, authority figures, other people that is causing her frustration one way or the other. Maybe it was a frustration she felt was justified, or an impediment that she felt was unjustified, but more than one person who had no ax to grind had things to say that troubled the court very much. So I think this evaluation could be very helpful for [mother], and very helpful for [E.]. It's not that [mother] needs a therapist to make her love [E.] more. That's not remotely the problem. And the court wants the parties to understand that that's how the court views the situation. I think, [father], there's some work you need to do here as well." The court told the parties it

4

would issue an order incorporating the evaluator's recommendations, and it set the next hearing date for July 19, 2013.

## III.

## July 19, 2013 hearing

The parties returned to court on July 19, 2013, after a follow-up assessment by evaluator Peters. The evaluator testified at the hearing as follows.

Father reported that E.'s anger issues had improved and that E. had most recently had an outburst in April. E. had a "team"—a school psychologist, a linguist, a math specialist, and two teachers—working with him. Father and the team had decided to have E. repeat kindergarten in order to give him another year to adjust and mature. Further, E. was participating in different recreational activities and had progressed to attending school for the full school day.

Father requested that he maintain sole legal custody. He felt that communication between him and mother had not improved, and "he would like to have that first so that they could begin to make joint decisions." With respect to physical custody, father requested removal of the monitor for mother's visits, although he expressed reservations about that as E. had been doing much better and he did not want to do or change anything that might cause E. to regress.

Mother requested that she be awarded sole legal custody. She agreed that she and father continued to communicate poorly, and she expressed concerns that father had not followed the court's orders that she be provided with E.'s report cards and information regarding E.'s therapist and psychiatrist. She believed E. had become more angry and aggressive. As to physical custody, mother requested "to remove the monitor completely and reverse the custody situation." She believed E.'s behavior resulted from him feeling abandoned by her, and she said he would be happier emotionally and do better socially if he spent more time with her. Mother said she would consider a split custody plan, but that in any case she would want E. to transfer to a school in her area.

The evaluator noted that mother had made a report to the Department of Children and Family Services (DCFS) that E. had been emotionally and sexually abused by

5

someone in father's family. DCFS had concluded that the allegation was unfounded and there was no reason to suspect harm or danger to E. Further, the investigating social worker had concluded that mother was using DCFS as part of a contentious custody battle, was disruptive, and had difficulty controlling her anger and respecting authority.

The evaluator recommended that mother be permitted unmonitored visits with E. every Saturday, noting that she did not believe mother was a danger to E. and that E. said that he would like to have more time with mother. However, the evaluator recommended that father continue to hold sole legal custody, in part because of her concern that mother was unable to articulate what she had done to contribute to the current level of tension and lack of communication between herself and father. The evaluator also recommended that any future changes to physical custody be made gradually: "My recommendation is that in the event the court considers more [custodial time for mother] in the future, I would recommend that this child have a step-up plan. I want to be clear. I know this child's plan will need to change over time. I think that everybody in this courtroom is aware of that. But given this child's emotional development and the time it takes to adjust to changes, I think that a step-up plan would be more warranted than a sudden change or shift."

The court then asked each parent what role he or she played in their "pretty contentious, pretty dysfunctional relationship," and asked what each was going to do to make it better. Father admitted that he made assumptions about mother's intentions, which caused him to be dismissive of her and to "shut down." He said that he would use "Our Family Wizard" (an online tool provided by the court) as a means to communicate with mother, and that he would provide mother with E.'s psychiatrist and school information. When it was mother's turn, she said that she did not believe that there was anything she needed to change: "I've always communicated . . . I don't believe that there's something I need to change right now."

At the conclusion of the hearing, the court ordered that father would continue to have sole legal and primary physical custody of E.; mother would have unmonitored visits with E. every first and third weekend of the month from Saturday morning to

6

Sunday evening, and every second and fourth weekend from Saturday morning to Saturday evening; the parents would exchange E. at the Fullerton Police Department; neither parent would speak in a negative manner about the other; and "[i]n the event the court considers more time for Mother in [the] future[,] a Step Up Plan would be recommended given the child's age, emotional development and the time it takes this child to adjust to and recognize changes in his schedule."

The court addressed mother: "I have to say, Miss Pablo, it is striking that the DCFS employee came to the exact same conclusion this court has come to . . . [that you] are . . . in denial – about your difficulty with authority, . . . about your disruptive behavior, about using the system in a way to be contentious. And it is exactly what teachers have said. And it is exactly what law enforcement has said. . . . [I]t is noteworthy that neutral parties, over time, observed the same traits. And that creates conflict. And this court is trying to shield this conflict away from [E.]."

When mother's counsel asked if there was a going to be a "come back date in this case," the court responded: "At this point, no. Either party may seek a modification. I will say this. The court will not be inclined to make any changes for at least a year because I want to see how [E.] does through school and through the therapy that he's going to be undertaking. [¶] . . . [¶] . . . The court is not issuing an order forbidding either party from access to the court. I want that clear. But let me simply say, the court does not want to have, every three months, one party or the other saying, 'well I have a right to make this request, and I'm going to make this request.' The standard will always be the best interest of the child. We won't have to show a change of circumstances. And the court will be interested in hearing from therapists, teachers, or anyone else. But the court will be particularly interested in how the parties comply and what insights the parties come to that they can share with the court that has an impact."

**IV.**

**Mother's 2014 Request For Joint Legal and Physical Custody**

Mother filed a request for joint legal and physical custody of E. in September 2014. She urged that joint custody would be in E.'s best interests because she had been

7

his primary caregiver for the first five years of E.'s life, and joint custody would "restore balance into [E.]'s life and provide him with the benefit of co-parenting." In her supporting declaration, mother described the strong bond between E., herself, and E.'s infant half-brother Chase. Mother asserted that she was very attentive to "the development of [E.]'s cognitive abilities and skills," and she said that being "cut off" from E.'s teachers, therapists, and other providers over the past year had put her at a "big disadvantage." Mother asserted that she had repeatedly asked father to transfer E. to a school that was mid-way between their two residences, and said that father's refusal to do so "is another example of [his] one-sided decisions which leave[] me at a big disadvantage."

Mother submitted the declaration of E.'s maternal grandmother, maternal grandfather, and two maternal aunts, each of whom stated that mother was a good parent and had a strong bond with E.

Father filed a responsive declaration on October 1, 2014, indicating that E. was flourishing in his current school environment, and that a change in custody would not be to E.'s benefit. Father asserted: "[F]or the first time our son is doing well in school and is doing well behaviorally as well. It seems to me that for the first time, our son has found true structure and stability. Because he is doing so well, I am fearful that a change to his custodial schedule will cause serious problems for him and that he will regress." Further, father said the high level of conflict between himself and mother had made it difficult for them to make joint decisions, noting that mother sought to change E.'s school "without considering the effect on him and without providing a rational basis, other than [her] personal convenience." Father also included notes from E.'s elementary school detailing E.'s progress.

Following the October 15, 2014 hearing, the court entered an order denying mother's request to modify the custody and visitation order. The court observed that though mother argued that a change of custody would be in E.'s best interest, she offered no evidence in support. Further, the court noted that in the past there had been tremendous conflict between mother and other adults in E.'s life, and mother had made

8

no showing that the conflict was unlikely to recur. The court said: "This is a mother who causes havoc wherever she goes. She has a very serious problem with authority. We've had police officers in this court testify about how she acts at the police station with the child. We've had school officials say how she disrupts the school operation. We've had [father's] parents testify about her assault of them. So there are some very serious problems that Miss Pablo has, including her complete denial of her responsibility in any of these things. So the court is loathe to make changes without some recognition on [mother's] part that she has screwed up in the past and that she is on a better path. And I don't see that."

Mother timely appealed from the order denying her request to modify custody and visitation.

## DISCUSSION

### I.

### Applicable Legal Standards

California's statutory scheme governing child custody and visitation determinations is set forth in the Family Code.[2] Under this scheme, "the overarching concern is the best interest of the child." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) In making custody determinations, "consideration of the best interest of the child may lead the trial court to award custody either to both parents (joint or shared custody) or to only one parent (sole custody). If a parent is awarded 'sole legal custody,' that means the parent 'shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child.' (§ 3006.) If a parent is awarded 'sole physical custody,' that means the child 'shall reside with and be under the supervision' of the custodial parent, 'subject to the power of the court to order visitation' for the noncustodial parent. (§ 3007.)" (*In re Marriage of Brown and Yana* (2006) 37 Cal.4th 947, 956 (*Brown and Yana*).)

---

[2]    All subsequent statutory references are to the Family Code.

For purposes of an initial custody determination, section 3040, subdivision (b), affords the trial court and the family " ' "the widest discretion to choose a parenting plan that is in the best interest of the child." ' " (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31 (*Burgess*).)" (*Brown and Yana*, *supra*, 37 Cal.4th at p. 955.) Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, courts generally require a parent seeking to change the existing custody arrangement to demonstrate " 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest." (*Id*. at p. 956.) In the present case, however, the trial court stated at the July 2013 hearing that if either parent sought a future modification of the existing custody arrangement, he or she would not be required to show changed circumstances. Accordingly, the sole basis for the trial court's 2014 order—and the only issue before us—is E.'s best interests.[3]

In reviewing the trial court's custody and visitation order, we apply the deferential abuse of discretion standard, "measuring 'whether the trial court could have reasonably concluded that the order in question advanced the "best interest" of the child.' [(*Burgess*, *supra*, 13 Cal.4th at p. 32.)] . . . We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence. [Citations.]" (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935.)

## II.

## The Trial Court Properly Considered the
## Factors Set Out in Section 3011

Mother's sole contention on appeal is that the trial court failed to consider the factors identified in section 3011. That section provides that in making a determination

---

[3]  Mother contends that notwithstanding its assurance that it would not require a showing of changed circumstances, the trial court did precisely that. We do not agree. The transcript of the October 2014 hearing, which we have carefully reviewed, makes it abundantly clear that the trial court considered only best interest, *not* changed circumstances.

of a child's best interest in a custody proceeding, the court "shall, among any other factors it finds relevant, consider all of the following:

"(a)    The health, safety, and welfare of the child.

"(b)    Any history of abuse by one parent or any other person seeking custody . . .

"(c)    The nature and amount of contact with both parents . . .

"(d)    The habitual or continual illegal use of controlled substances, the habitual or continual abuse of alcohol, or the habitual or continual abuse of prescribed controlled substances by either parent. . . .

"(e)(1)  Where allegations about a parent pursuant to subdivision (b) or (d) have been brought to the attention of the court in the current proceeding, and the court makes an order for sole or joint custody to that parent, the court shall state its reasons in writing or on the record."

Mother suggests that because the trial court did not articulate "any reasons for" its custody determination, "it is anybody's guess as to whether any of the factors listed in Family Code § 3011 [were] considered by the trial court." In other words, mother appears to suggest that because the trial court did not make specific reference to the section 3011 factors, it must have ignored them. We do not agree. "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Thus, mother has the burden to affirmatively show error by citation to the record. (E.g., *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.) Her suggestion that the trial court *may have* committed error because it *may have* failed to consider mandatory factors, without more, does not satisfy her appellate burden.

Further, section 3011 requires that the court state its reasons "in writing or on the record" *only* if it awards custody to a parent who has a history of child or spousal abuse or of habitual or continued illegal use of drugs or alcohol. (Subd. (e)(1).) Neither parent has a history of chronic substance abuse or abuse of a child or spouse, and thus the requirement that the court state reasons for its custody determination does not apply here.

11

Finally, our independent review of the record satisfies us that in considering mother's request for joint legal and physical custody, the court appropriately considered the two section 3011 factors relevant here—i.e., the "nature and amount of contact with both parents" and E.'s "health, safety, and welfare." The court's comments at each of the custody hearings in this case make clear that the trial court awarded sole legal and physical custody of E. to father because it concluded mother and father were unable to communicate effectively or make decisions together, and therefore would be unable to implement a joint custody order. To be workable, joint custody requires the parents' willingness to cooperate in making medical, educational, and psychological decisions. (See *In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 115-116 [observing, in most circumstances, children's best interests are served by joint legal custody, but where there is acrimony "the reality of their parents' conflicts unavoidably hampers the realization of that goal"].) Mother cites no evidence presented in the trial court to contradict the court's conclusion that the parties are unable to communicate effectively with one another and, therefore, would be unable to implement a joint custody order. To the contrary, mother's declaration in support of her request for modification highlights the conflict between herself and father—and, indeed, suggests that *father* should be ordered to counseling sessions "so that [father] can acquire some skills for a co-parenting plan."

Further, in declining to modify the custody order, the trial court emphasized that mother in the past had acted in ways that maintained a high level of conflict between herself and father and had shown no willingness to conduct herself differently in the future.[4] Mother cites no evidence that contradicts this finding. Instead, her testimony in

---

[4] Specifically, the court said that it continued to be concerned with mother's "very serious problem with authority," noting that in the past mother had assaulted E.'s paternal grandparents, disrupted the operation of E.'s school, and acted inappropriately at a police station while dropping off or picking up E. The court emphasized, moreover, that mother had made no showing that she "is on a better path"—i.e., that she recognized past errors and was committed to behaving differently in the future.

the trial court acknowledged the conflict between her and other adults in E.'s life, but placed the blame for those conflicts on others.

Finally, mother's reliance on *Burchard v. Garay* (1986) 42 Cal.3d 531, 535, is misplaced. There, the California Supreme Court, in reversing the lower court's decision, found that the trial court impermissibly relied on the relative economic positions of the parties as a relevant factor in determining custody. (*Id*. at p. 535.) Those facts are not present here. Notwithstanding mother's intimation to the contrary, there is absolutely no evidence that the trial court took father's financial standing into account when denying mother's request to modify the custody order.

## DISPOSITION

The order denying mother's request for modification of child custody and visitation is affirmed. Father is awarded his appellate costs.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.




LAVIN, J.



13