Filed 10/22/21  In re C.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C.T. et al, Persons Coming Under the Juvenile Court Law. | |
| | D078744 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. Nos. EJ4517A-B) |
| Plaintiff and Respondent, | |
| v. | |
| N.T., | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

N.T. (Mother) and B.T. (Father) are the parents of C.T. and O.T., minor children declared dependents of the court pursuant to Welfare and

Institutions Code section 300.[1]  During the course of the dependency proceedings, Father was granted a restraining order against Mother pursuant to section 213.5, subdivision (a).  On appeal, N.T.'s sole contention is that the juvenile court abused its discretion by ordering her to stay away from the children's school.  We disagree and affirm.

BACKGROUND

A. *History of Domestic Violence and Child Neglect*

Mother and Father have a history of engaging in violent altercations in front of C.T. and O.T.  On one occasion, they punched and hit one another in the face and/or head when the children were present.  Another time, they engaged in mutual combat in front of the children after Mother accused Father of cheating.  Father put his hands on Mother's throat during this incident, which led to his arrest.

Mother and Father also have a history of neglecting the children. Mother had been inconsistent with taking C.T. to school and was "extremely late" picking him up from school multiple times.  In addition, C.T.'s rideshare driver reported that C.T. was wearing the same clothes for four days and had poor hygiene.  When law enforcement contacted Mother regarding these incidents, she appeared "disoriented and confused."  The deputies could not get a hold of Father.  A week later, C.T.'s rideshare driver reported that Mother wanted C.T. dropped off at a pawnshop in El Cajon.  The rideshare driver declined.  When Mother then refused to pick up C.T. at their residence, he was taken into protective custody.  Father was working when he learned that C.T. had been taken into custody.

---

1    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The San Diego County Health and Human Services Agency (Agency) became involved with the family around this time.  The Agency offered, and the family agreed to, a voluntary case.  However, Mother and Father failed to comply with the Agency's terms, which included drug testing and parenting courses.

After the choking incident referenced *ante*, the Agency set up a safety plan for the family.  Mother was directed to stay at a friend's home with the children that night and then to enter a women's shelter the next day.  The parents were also prohibited from contacting one another.  Mother violated the safety plan by leaving the children at her friend's home that night for three hours while she gambled at a local casino, by calling and texting Father repeatedly, and by refusing to stay at a women's shelter.

B. *The Juvenile Dependency Proceedings*

As a result of the foregoing, the Agency filed a juvenile dependency petition on February 25, 2020.  A few days after the children were removed from their care, Mother and Father engaged in two altercations in one day.  Father told a social worker that, during the first incident, Mother again accused him of cheating and that, at one point, she jumped out of a moving car.  Father claimed she was yelling at him, and she smashed her phone and threw her purse.  During the second incident, Mother was going through Father's phone looking for evidence of cheating while Father was driving.  When Father grabbed his phone out of her hand, Mother grabbed his coat, causing the car to jerk.  Mother then unbuckled her seatbelt and climbed over the middle console to try to take the phone back.  Father put his arm on the back of Mother's neck to "pin her down" but stopped when he noticed she couldn't breathe.  Father was hesitant to share this information with the social worker because Mother "scares" him.  He said, " 'she is going to be

3

angry about this. [Mother] will come after me and I'm scared of that.' " Father believed "that [Mother] would do anything to stop him from seeing his children."

These incidents continued to occur because Mother repeatedly violated the safety plan. She returned to the camper van several times and continued to contact Father, even as he tried to limit his interactions with her. A social worker noted that she received threatening text messages from Mother that were intended for Father.[2] In one, Mother wrote, " 'If you show [the social workers] I'm sharing [messages from them], your [*sic*] fucking everyone, especially the kids–and that will force me into further action so don't do or say anything stupid.' "

Mother's mental health began to appear prominently in the Agency's records. She claimed her phone and computer were hacked, and that people were watching her through the devices and following her. A family friend expressed concern to a social worker about the children's safety in Mother's care due to her "erratic behavior." According to this friend, Mother's "paranoia" was increasing, leading her to "hide out and keep[ ] track of people's license[ ] plates." Mother had also been seen placing the children in the car in order to follow Father, returning hours later.

Because of concerns with Mother's "unpredictable behaviors," the Agency recommended a psychological evaluation. The evaluation was completed in July 2020. Mother was diagnosed with an anxiety order, not otherwise specified (NOS), posttraumatic stress disorder, psychotic disorder

---

[2]    Mother was also reported to have sent one social worker, as well as the children's caregiver, multiple text messages each day, some with threats and vulgar language. The social worker noted that Mother would sometimes leave a combination of 40 emails, text messages, and phone calls in one day. Another time, Mother waited in her car in the Agency's parking lot in order to accost a social worker whom she blamed for the children's removal.

NOS, and alcohol abuse. With this evaluation came a treatment plan that included therapy, medication, classes, and substance abuse testing, but Mother made, at best, only "some" progress.

During this time, Mother continued to engage in concerning behavior toward Father. She accused him of tracking her on multiple devices. She once took his phone to get it " 'scrubbed' " so that she could go through it. She called and texted Father daily to accuse him of cheating and hacking. She contacted Father's coworker, accusing them of having a relationship. She also accused Father of having an inappropriate relationship with the children's caregiver. She threatened to accuse Father of assaulting her if he did not do as she wanted him to do. She made several unannounced visits to the home where Father was temporarily staying, resulting in arguments and Father's need to find a new home. She also created fake Facebook profiles in his name, and contacted Father's cousin to accuse Father of being a child molester. Father reported that he tried to block Mother's number multiple times, but she kept contacting him using new numbers.

C. *Father's Request for a Restraining Order*

On December 16, 2020, Father filed a request for a restraining order. Underlying this request was Father's claim that Mother caused him to fear physical or emotional harm, stalked him, stole tools from their camper van, and defaced its door. Mother was alleged to have sent Father harassing texts and calls from unknown numbers. She also reportedly left a threatening voicemail for Father indicating she was going to go to the police and have him arrested. Father feared that Mother would show up at one of his unsupervised visits and thereby delay reunification in this case. He requested, among other things, that Mother be ordered to stay away from his

residence, his workplace, and the children's school and place of childcare. The superior court issued a temporary restraining order that same day.[3]

D. *Placement of Children with Father*

Father began overnight visits with the children on January 24, 2021. He then began a 60-day in-home trial with them one month later. Father was reported to be adjusting to getting the children to school on time and meeting their needs. The Agency was attempting to clear Father's neighbor to help with taking the children to school in the mornings. Father was also working with C.T.'s school to determine whether transportation services would be provided. Father's progress with his services has been described as "good," with the social worker noting that he is placing the children's needs first.

E. *Hearing on Father's Request for Restraining Order*

The juvenile court heard Father's request for a restraining order on March 10, 2021 and March 19, 2021. After hearing testimony from Mother and the social worker and arguments from counsel, the juvenile court found that the restraining order was warranted because Mother made "annoying and harassing phone calls," and she threatened to have Father arrested. The juvenile court was further concerned with "Mother just showing up when not being asked to do so, in particular, since [Father] has the placement of the children in his home. Because that could escalate to a situation that would put the children in harm's way." The juvenile court found that Mother was

---

[3] It appears the juvenile court's order granting a temporary restraining order checked the incorrect box pertaining to the school from which Mother was ordered to stay away. The court checked the box for the "school of anyone in item 1," which ostensibly refers to a school attended by Father. As there is nothing in the record to suggest that Father was attending a school, the court likely intended to check the next box for "the child(ren)'s school or child care."

"fixated" on Father and his actions, continuing to contact him when he asked her not to. The court determined that a restraining order was necessary to limit the children's exposure to conflict between the parents, and thereby issued a restraining order against Mother for one year. Mother was enjoined from contacting Father in any way; from molesting, attacking, striking, stalking, or threatening him; from destroying his personal property; and from disturbing his peace. In addition, Mother was ordered to stay at least 100 yards away from several locations, including the children's school and place of childcare. Mother's timely appeal followed.

DISCUSSION

Mother contests the restraining order only insofar as it enjoins her from going near the children's school.[4] Mother first argues the juvenile court acted on its own accord in ordering her to stay away from the school since no party requested it at the hearing on the restraining order. Mother next argues that the restraining order was improperly issued for the protection of the school. She claims the school did not request, and could not obtain, a restraining order against her under Code of Civil Procedure section 527, and the school is not subject to protection under the Domestic Violence Protection Act (DVPA, Fam. Code, § 6200 et seq.). We are unpersuaded.

A. *Standard of Review*

There exists a preliminary dispute as to the proper standard of review of the juvenile court's restraining order. Mother contends we review for abuse of discretion. The Agency asserts we review for substantial evidence. Both are correct.

---

4    Mother does not contest the inclusion of the "place of child care" in the restraining order; her argument is limited to the "school." Although O.T. was in a childcare setting (as opposed to a school) when the restraining order issued , we construe Mother's objection to include O.T.'s daycare.

We review the juvenile court's grant or denial of a DVRO request for an abuse of discretion.  (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.)  " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' "  (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)  "We draw all reasonable inferences in support of the court's ruling and defer to the court's express or implied findings when supported by substantial evidence."  (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 935.)  "All conflicts in the evidence are drawn in favor of the judgment," and "[w]hen supported by substantial evidence, we must defer to the trial court's findings," including its finding on the credibility of witnesses.  (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364–365.)  "The practical differences between the two standards in this context are not significant.  [Citation.]"  (*In re N.L.* (2015) 236 Cal.App.4th 1460, 1466.)  Here, under either standard, we conclude the juvenile court did not err by including the school in the restraining order.

B.  *Juvenile Court Did Not Err as to Scope of Restraining Order*

During the pendency of a dependency petition, the issuance of a restraining order is governed by section 213.5 of the Welfare and Institutions Code.  A parent of a dependent child may apply to the juvenile court for an order "enjoining a person from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning" him or her, from destroying the parent's personal property, from contacting or coming within a specified distance of him or her, or from disturbing the parent's peace.  (§ 213.5, subd. (a).)  Where, as here, the conduct is "related to domestic violence"—defined to include "abuse perpetrated against . . . [¶] (a) A spouse or former spouse"—then application must be made in the manner

8

provided by the DVPA. (*Ibid.*; Fam. Code, §§ 6211, 6300, 6320, subd. (a).)[5] Otherwise, application must be made in the manner provided by section 527 of the Code of Civil Procedure. (Welf. & Inst. Code, § 213.5, subd. (a).)

As noted, Mother does not challenge the restraining order itself; her objection reaches only its scope. As we will explain, substantial evidence supported the juvenile court's order enjoining Mother from going near the children's school. As an initial matter, the record supports the juvenile court's findings that Mother engaged in a series of harassing behaviors toward Father. She continued to call and text him daily and made several unannounced visits to where he was staying, even as he sought to limit those interactions. She also repeatedly threatened to interfere with Father's reunification plan with the children and to falsely report Father to law enforcement for abuse. Additionally, Mother's mental health issues were extensively documented, manifesting as paranoia about being followed and tracked by others. She obsessed that Father was cheating on her with others, including with a coworker and the children's caregiver; that he was hacking her electronic devices; and that he was hiding evidence of his dalliances, leading her to monitor his phone use and even taking his phone to "scrub" it. As a result of this unwanted, abusive, and threatening contact, the parents would argue and engage in altercations, which was the primary reason for the Agency's involvement with this family.

---

[5] The DVPA defines "abuse" to mean "any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) *To engage in any behavior that has been or could be enjoined pursuant to Section 6320.*" (Fam. Code, § 6203, subd. (a), italics added.) The behaviors listed in section 6320 of the Family Code encompass the conduct listed in section 213.5, subdivision (a) of the Welfare and Institutions Code.

By the time of the hearing, Father had been granted a 60-day in-home trial with the children. This placement was proceeding successfully, and Father was putting in substantial effort to meet the children's needs. As the primary caregiver, Father was responsible for ensuring the children's timely attendance at their school. To assist with their transportation needs, Father sought help from a neighbor, C.T.'s school, and the Agency. Mother latches onto this to argue that the school should not have been included in the restraining order since Father was trying to outsource school transportation. We disagree. The record merely indicates that Father sought help because of his work schedule, not that he was foregoing all school-related responsibilities. Mother next argues the restraining order should have been limited to only those short intervals during morning drop-off and afternoon pickup. We again disagree. There was evidence that Mother once waited in a parking lot to accost a social worker, and she appeared unannounced several times at locations frequented by Father. This is substantial evidence to support the juvenile court's order enjoining Mother from going near the school at any time, not just during drop-off and pickup times.

Mother insists, however, that the juvenile court's inclusion of the school in the restraining order was error since Father did not request this at the hearing thereon. The record confirms that neither Father, the children's trial counsel, nor the Agency raised this issue at the hearing. This, according to Mother, evidences their belief that she did not need to be restrained from going to the school. But Mother does not dispute that Father did specify in his request for a restraining order that Mother be ordered to stay away from the school. Mother provides no authority for the proposition that Father relinquished this request by failing to later raise it at the hearing. We conclude the juvenile court did not err in this regard.

Mother next argues the juvenile court erred in that it issued the restraining order for the protection of the children's school. She claims this was improper because the school is not subject to protection under the DVPA. Mother further notes the school did not seek a restraining order against her pursuant to section 527 of the Code of Civil Procedure, and it would not be entitled to one regardless. We agree the DVPA is not intended to protect a school. (See Fam. Code, § 6211 [defining "domestic violence" as abuse against certain enumerated "persons"].) We also acknowledge the school did not seek a protective order against Mother. Even so, we find it unnecessary to consider whether the school would be entitled to one because the restraining order in this case was issued to protect *Father*, not the school. Mother provides no basis to conclude otherwise.

DISPOSITION

The order of the juvenile court is affirmed.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

11