Filed 4/23/21  J.M. v. G.H. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.M.,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>G.H.,<br><br>  Defendant and<br>  Respondent. | B305382<br><br>(Los Angeles County<br>Super. Ct. No. BF037073) |

  APPEAL from orders of the Superior Court of Los Angeles County, Joshua D. Wayser, Judge.  Affirmed.

  Hoover Law and Sarah J. Hoover for Plaintiff and Appellant.

  No appearance for Defendant and Respondent.

      _____

J.M. appeals from an order denying his postjudgment request to modify custody and visitation for his then 14-year-old son and an order denying his request for a statement of decision. Finding no error, we affirm the orders.

## BACKGROUND

This matter involves a custody dispute regarding a child named Joey, between J.M. (Joey's father) and G.H. (Joey's mother).  J.M. and G.H., who never married, ended their relationship of more than 10 years in 2007, when Joey was two years old.  G.H. has no other children.  J.M. had been married three times before his relationship with G.H., and he has three adult children from two of the earlier marriages.  In 2008, J.M. married M.H.  (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 928.)[1] He later adopted her son.  Joey has relationships with all his half siblings.

## I.    2012 Judgment on Custody and Visitation

In 2009, J.M. filed a petition to establish paternity of Joey and later requested sole legal and primary physical custody of Joey.  In response, G.H., an Israeli citizen, requested sole legal and physical custody of Joey and an order allowing her to move to Israel with Joey, with visitation for J.M. in the United States and Israel.  (*J.M. v. G.H.*, *supra*, 228 Cal.App.4th at p. 928.)

After a 12-day trial, the trial court (Judge Robert A. Schnider) issued a judgment on custody and visitation on May 17, 2012 (hereafter, the judgment), when Joey was six years old. (*J.M. v. G.H.*, *supra*, 228 Cal.App.4th at p. 931.)  Under the judgment, which is included in the record in the present appeal, the parties share joint and physical custody of Joey.  Joey lives

---

[1] We issued a published decision in J.M.'s appeal from the 2012 judgment on custody and visitation of Joey, described below.

2

with G.H. in Israel during the school year, and he attends school in Israel.[2] Joey lives with J.M. in the United States during his winter, spring, and summer breaks from school. The judgment allows J.M. to have visitation with Joey in Israel and G.H. to have visitation with Joey in the United States. Over G.H.'s objection, the judgment requires J.M. and G.H. to communicate with each other using a program called OurFamilyWizard (OFW), notwithstanding an expert declaration G.H. presented at trial stating G.H. has dyslexia and attention deficit hyperactivity disorder, which makes it difficult for her to read communications on OFW. The judgment requires the parties to file any request for modification of the judgment in a "California court having jurisdiction." J.M. appealed from the judgment, and this court concluded, among other things, the trial court did not abuse its discretion in its custody determination. (*Id.* at pp. 935-939.)

In August 2015, Joey moved to Israel with G.H. In or around 2017, J.M. moved to Florida with his wife M.H. and their son, who is a few years older than Joey.

## II.     J.M.'s Current Request to Modify Custody and Visitation

On April 11, 2019, when Joey was 13 years old, J.M. (through counsel) filed in Los Angeles County Superior Court the current request to modify custody and visitation. He requested the trial court swap the parties' physical custody, so that Joey would live with him in Florida during the school year and with G.H. in Israel during school breaks. He also requested sole legal

---

[2] At the time of the proceedings at issue here, Joey attended an American International School in a suburb of Tel Aviv. J.M. selected Joey's school in Israel, as allowed under the judgment.

custody as to Joey's mental health treatment and school selection, with joint legal custody remaining in all other areas.

In his memorandum of points and authorities and in his declaration supporting his request to modify custody and visitation, J.M. asserted it was in Joey's best interest to attend school in the United States, beginning in August 2019, for several reasons. First, he informed the court that G.H. refused to communicate with him on OFW, as the judgment required. G.H. had not logged onto OFW since August 3, 2016 (more than two and a half years), thus failing to respond to the messages J.M. sent her regarding Joey's health, activities, and education. J.M. asserted he learned information about Joey's life from Joey, although G.H. obstructed telephone contact between Joey and J.M. and M.H. by interrupting the calls. On the occasions when G.H. communicated with J.M. in writing, she used email, text, or the WhatsApp application.

Second, J.M. complained that G.H. changed the date of one of Joey's Bar Mitzvah parties (the children's party, not the family party) to a date that J.M. and his other children could not attend. She also failed to send J.M. pictures from the Bar Mitzvah party for more than five months and refused to provide the name of the photographer to J.M.

Third, J.M. informed the trial court that Joey had mental health treatment in 2018, and G.H. refused to engage in joint conversations with J.M. and Joey's therapist in Florida and refused to provide contact information for Joey's therapist in Israel, which J.M. located on his own. According to J.M., Joey's mental health issues arose "as a result of his having had to assume a parental role in [G.H.]'s home," due to G.H.'s medical issues. The school contacted J.M. (and G.H.) and stated staff

4

believed Joey needed counseling and they were concerned he might hurt himself.

Fourth, J.M. asserted G.H. failed to properly supervise Joey. According to J.M., Joey stayed up late at night and was permitted to be out in the streets alone at night. He viewed inappropriate material on the Internet and used profanity. He was tardy to school 20 times during the current school year, although G.H. did not work outside the home. He was not completing school assignments on time and was underperforming at school academically due to issues with procrastination, organization, and focus.

Fifth, J.M. was concerned about Joey's safety in Israel due to "the current state of conflicts and unrest in the region."

J.M. asserted his "efforts to address these issues with [G.H.] have failed." He further argued: "It is abundantly clear that [G.H.] has no intention of co-parenting Joey and no intention of communicating information about their son in writing to [J.M.] as ordered by the Court. Under these circumstances, the Court should exercise its discretion to modify child custody and order Joey's return to the United States without delay for the start of the 2019-2020 school year." J.M. pointed out that in the 29-page statement of decision the trial court issued before it entered the judgment on custody and visitation in 2012, the court expressly stated that the order allowing Joey to live with G.H. in Israel during the school year was "made on [G.H.'s] anticipated compliance with the orders protective of [J.M.]'s relationship. As this anticipated behavior is a key basis of this ruling, failure to meet that expectation would be a change of circumstance." J.M. argued he had "shown that there has been a significant change of circumstances (the complete failure of [G.H.] to communicate

5

with [J.M.] via OFW for almost three full years) and that Joey's best interests require modification of the moveaway order."

G.H. did not respond to J.M.'s request to modify custody and visitation. At a hearing on June 19, 2019, at which G.H. did not appear, the trial court ordered the modification as J.M. requested. On July 17, 2019, G.H., who was now represented by counsel, filed an ex parte application to set aside the order modifying custody and visitation. After hearing the matter, the trial court granted the motion to set aside the order and appointed counsel for Joey.

On October 4, 2019, J.M. filed a notice of intent to present live testimony pursuant to Family Code section 217[3] at an evidentiary hearing on his request to modify custody and visitation. He indicated he planned to call the following witnesses: himself, G.H., Dr. Jason Quintal (the mental health therapist who treated Joey in Florida), and David Makovsky ("an expert on the issue[s] of safety and security in the Middle East, including Israel").[4]

---

[3] Family Code section 217 provides, in pertinent part: "At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties or a finding of good cause pursuant to subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties." (Fam. Code, § 217, subd. (a).)

[4] J.M. did not call David Makovsky as a witness at the evidentiary hearing.

### III. Evidentiary Hearing on J.M.'s Request to Modify Custody and Visitation

The three-day evidentiary hearing was held on October 25, 2019, November 21, 2019, and January 22, 2020 before a different judge (Judge Joshua D. Wayser) than the judge who issued the judgment on custody and visitation in 2012.

Before the testimony commenced, the parties stated on the record that Joey was no longer being treated for mental health issues. Joey's counsel informed the trial court: "[W]e are in a very good place for this child in terms of who he is as a human being, and I think both parents would like this trajectory of good welfare to continue." Counsel also informed the court that Joey preferred not to testify or take a position on the custody determination.

At the evidentiary hearing, J.M. presented his case-in-chief through the testimony of G.H., Dr. Quintal and himself. Throughout the hearing, the trial court questioned the witnesses and engaged in dialogue with counsel for J.M., G.H., and Joey regarding the factual and legal issues in the case.

At the conclusion of J.M.'s case, the trial court concluded J.M. did not meet his burden on his request to modify custody and visitation. Accordingly, G.H. did not present her case, but she testified on adverse direct examination in J.M.'s case.

#### A. G.H.'s testimony

G.H. testified by telephone from her home in Israel. Her counsel was present in court.

J.M.'s counsel asked G.H. about her medical conditions— autoimmune disorders which required infusion treatments and an extensive surgery on her Achilles tendon in 2016. G.H.

testified that Joey assisted her around the house while she was recovering from the surgery.

Regarding Joey's performance in school, G.H. stated Joey did not make the honor roll in the first semester of the previous school year, but he made it in the second semester. According to G.H., Joey's grades on his current progress report were an A- in physical education, a C in art class, and four B's. G.H. did not send a copy of the progress report to J.M., although she acknowledged the 2012 judgment required her to do so. She also conceded she did not regularly provide information to J.M. regarding Joey's extracurricular activities or her meetings with school personnel. G.H. believed that Joey was tardy to class 11 times during the 2018-2019 school year. During a parent-teacher conference, G.H. was told Joey needed to improve his time management skills and that he sometimes had difficulty focusing.

G.H. conceded she had not logged into the OFW program since 2016. She was aware that the 2012 judgment required her to communicate with J.M. through OFW. When the trial court asked her why she declined to comply, she stated that she had "developed a fear" of OFW because J.M. "abused it" by sending her "thousands of emails nonstop" over several years. According to G.H., in late 2015, she asked J.M. if they could communicate using the WhatsApp application, which was easier for her to use than OFW. She represented that they reached an understanding to use WhatsApp for their communications, and in exchange she agreed that J.M. could visit Joey whenever he wanted when he was in Israel.

G.H. testified that in 2018, before Joey's spring break from school, she did not know Joey was having any "emotional

difficulties." At no time did she believe Joey was having suicidal thoughts.

In or around April 2018, G.H. received a telephone call from Joey's homeroom/science teacher, who explained that during drama class, Joey simulated hanging himself with a noose, but he did it in a silly way. He also wrote a story that was published in the school literary journal in which he stated he felt responsible for his parents' separation. After receiving the call from the teacher, G.H. contacted J.M. about the issue. When Joey returned home from school that day, she spoke with Joey about it, asked him if he wanted to talk to a therapist, and he said he did.

According to G.H., she contacted J.M. to tell him Joey wanted to see a psychologist. She decided to arrange for Joey to see a therapist in Israel. She said that unbeknownst to her, J.M. planned to arrange for Joey to see a therapist in Florida during summer 2018. G.H. asked a counselor at Joey's school for recommendations for therapists in Israel. According to G.H., J.M. told her he would not agree to any therapist she (G.H.) proposed.

G.H. testified that in spring 2018, Joey saw a therapist in Israel named Dr. Rubenstein, and in summer 2018, he saw a therapist in Florida named Dr. Quintal. G.H. stated she had communications with both Dr. Quintal and Dr. Rubenstein that did not include J.M. In communications with Dr. Rubenstein, G.H. acknowledged she may have referred to Dr. Quintal as a "quack." G.H. continued to have communications with Dr. Rubenstein during the pendency of these proceedings, including communications regarding J.M. The trial court expressed

concern about such communications between G.H. and Joey's therapist.

According to G.H., when Joey returned from Florida at the end of summer 2018, he told her he no longer wanted to see Dr. Rubenstein or any therapist in Israel because he felt fine. G.H. testified that at that time, Dr. Rubenstein told her he did not believe Joey would hurt himself. G.H. told Joey he could resume therapy at any time. G.H. conceded that in her communications with Dr. Rubenstein during the pendency of these proceedings, Dr. Rubenstein told her Joey was having suicidal thoughts in spring 2018.

G.H. testified that Joey would have to serve in the Israeli army if he remained in Israel.

J.M.'s counsel examined G.H. at length about the children's Bar Mitzvah party that J.M. and his family could not attend because of when G.H. scheduled it. J.M. was able to attend the Bar Mitzvah ceremonies and the family party.

G.H.'s counsel and Joey's counsel reserved their examination of G.H. until after J.M. presented his case. As explained above, G.H. never presented her case.

**B.    Dr. Quintal's testimony**

Dr. Quintal testified that he has a bachelor's degree in psychology and elementary education, a master's degree in social work, and a doctoral degree (Ph.D.) in clinical sexology. Prior to earning his Ph.D., he worked for eight years in a public school district as a social worker. At the time of the hearing, he was in private practice.

Dr. Quintal explained that a primary care physician referred J.M. to Dr. Quintal. During the summer of 2018, Dr. Quintal met with Joey on four occasions. Prior to their first

meeting, Dr. Quintal spoke with Dr. Rubenstein, the therapist Joey had seen in Israel during spring 2018. Describing his conversation with Dr. Rubenstein, Dr. Quintal testified: "[W]e had discussed that Joey had challenges that [his] parents don't get along well. That he was experiencing depression. That he was somewhat sad and distraught. That he wasn't feeling very good. [¶] Those were really more of adjustment challenges with what we had talked about at that time."

During his treatment of Joey, Dr. Quintal learned that Joey had been "having depressed thoughts." Joey had also engaged in "burning [with a lighter] and cutting behaviors," as a result of feeling overwhelmed and out of control. Dr. Quintal observed some "superficial" cuts on Joey's wrist. Joey was stressed because he believed he was going to be forced to make a decision about who he wanted to live with, G.H. or J.M.

On August 29, 2018, Dr. Quintal spoke with G.H. about Joey's treatment. He told her Joey "was overwhelmed" and had mentioned to him that G.H. "had had an injury" and Joey "had to do a lot more caretaking because she wasn't physically able to do as much." Dr. Quintal also told her Joey was "feeling down and depressed" about a potential custody dispute. Dr. Quintal further told G.H. that Joey had been cutting himself, and G.H. said she was unaware of it. Dr. Quintal did not mention to her the burning behavior. He described to G.H. the traumatic events he had "unplugged or cleared" with Joey, such as the 2012 custody dispute, the move to Israel, and "knowing that his parents don't get along very well." He also described to G.H. Joey's thoughts about "being dead," which were not necessarily about committing suicide.

11

Dr. Quintal recalled that Joey "was much lighter and much happier" at the end of summer of 2018, after their four sessions together. Joey was no longer "burdened" by the move to Israel.

Dr. Quintal stated that he met with Joey three or four times during summer 2019 (a couple months before the evidentiary hearing). Joey was concerned about the pending custody dispute and whether he would be asked to decide where he wanted to live. Dr. Quintal testified: "He [Joey] likes being in Israel with the friends and relations that he already has. The transition the first time when he left [the United States for Israel] was a very difficult transition for him, so that was a big problem." Joey expressed concern about how G.H. would support herself without child support money from J.M. if Joey were in the United States during the school year. He also worried that G.H. would not be able to visit him in the United States.

The trial court asked Dr. Quintal what was important for the court to know about Joey's situation. Dr. Quintal responded:

"So my personal take on this, I think that Joey -- Joey says that he does not like Sarasota [Florida, where J.M. lives]. He would be okay living in L.A. [Los Angeles], but does not like Sarasota for whatever reason.

"He likes being with mom and thinks mom is a little more open minded. I think that he has much more freedom to do all sorts of things that he wants to do, and stay up late and all that kind of stuff which I think as a teenager is a thing that they might want, but may not be necessarily best for them.

"I think that at dad's house there is more structure. I think that they have an older brother who is also there. I think that that is a good situation for him, however, we also have to go with

12

he had difficulty adjusting the first time [when he moved to Israel].

"He is in a specialized program when he is in Israel meaning that he lives in Israel, but attending a U.S. school, so that is a much smaller setting. He knows everybody there, so it's just way more comfortable in Israel.

"Even if I would say, in my professional opinion, the household that dad has is a better household, knowing that he has got extended family [in Israel], a maternal grandmother, an uncle, and that he wants to be in Israel, I think we have to weigh that as a piece too, so I have a thing [*sic*], what is the actual best thing for him.

"I want him to make sure, regardless, him [*sic*] feel that mom is taken care of because I know that that is a heavy thing on him, and I know that he realizes that he's like a lifeline in that way with mom and that he helps mom a lot at home, and whether that's a burden that a child his age [14 years old] should have or not, it is what he does and he is willing to do that."

On cross-examination, Dr. Quintal conceded he never mentioned Joey's burning behavior to J.M. or G.H. He also explained he did not believe the cutting or burning behavior stemmed from suicidal thoughts. He described the origins of the behavior as follows:

"It was out of feeling overwhelmed and out of control, and what cutting does is it take[s] something that's out of control, and what burning does is it takes something that's out of control and makes it controlled, so now I'm in control of it.

"It localizes, it's something that is overwhelming and it localizes it to a particular area that I am in control of, and with

both cutting and burning, it produces endorphins that are released as that experience happens and it causes relief.

"So my interest with Joey wasn't about the [cutting and burning] stuff per se, but was about getting him so that he was not so stressed and, therefore, not having to use that maladaptive coping skill."

### C.    J.M.'s testimony

J.M. testified about Joey's positive relationships with him, his wife M.H., and his adult children.  He discussed the activities Joey engaged in during summers in Florida, including spending time with his cousins and attending sports camps.

J.M. stated that Joey wanted to attend college in the United States.  J.M. had researched high schools in Sarasota in anticipation of Joey starting school there if the trial court modified the custody order.

J.M. testified about spring break in 2018 when Joey told him he wanted to see a therapist.  He did not press Joey about why he wanted to see a therapist, but he told Joey he would make arrangements as soon as possible.  He immediately sent G.H. a message about his conversation with Joey through OFW.  Then, he contacted a pediatrician and was referred to Dr. Quintal.  He informed G.H. that he had found a therapist for Joey.

J.M. stated that he and G.H. never reached an agreement not to use OFW, and he continued to use it to communicate with her, although she told him she did not want to use it.  Since she stopped logging into OFW in early 2016, he had told her to check it for messages from him.

According to J.M., G.H. had not traveled to the United States to visit Joey when he was in J.M.'s custody, as permitted under the 2012 judgment.  J.M. travelled to Israel to pick up Joey

14

each time Joey visited him in the United States, and J.M. travelled back to Israel with Joey each time Joey returned to G.H.

When J.M.'s counsel asked him to state his concerns about Joey's safety, J.M. responded: "I have concerns in different areas. One concern I have is that he is out late at night periodically, often times on his own, whether he's walking the dog or he's walking home from a friend or coming home from a friend. One night he called me at -- I think it was about 1:30 or 2:00 in the morning to tell me that he'd like me to stay on the phone with him because he was afraid as he was walking home. It was late and he heard noises. And I told him of course I'll stay on the phone with him. I can't understand why he'd be out at that hour. But I am concerned about his safety in that respect. [¶] I'm also concerned about the -- you know, just the general safety factors of living in Israel on a regular basis. I mean I understand there are certain risks of visiting there, but it's nowhere near the risk of living there and being there most of the time." J.M. also testified about the military service requirement for Joey in Israel.

When J.M.'s counsel asked him why he wanted to change the custody arrangement, J.M. responded:

"Because I believe that Joey needs guidance, Joey needs counseling, Joey needs help in a lot of areas. Joey's grades would be better if he were with me, he would be more focused on getting his work done. He would be in an environment where there are controls, where there are limits.

"He wouldn't be free to roam the streets at night, he wouldn't be free to just do what he wants to do as is what appears to me to be the case now from what I know from Joey and from what I've observed.

"I mean -- I know that he would get prompt medical attention when he needed it. Dr. Quintal who is the only therapist that Joey has had that he [has] related to and has helped him is right there in Sarasota as well and can be of comfort to him if he ever needed or requested."

The trial court asked J.M.: "If [Joey] is in fact stabilized I guess the question is wouldn't the move then put him at a new risk? And that's what I'm worried about." Father responded: "No, on the contrary. I believe that one of the reasons why I would respectfully disagree about his being stable is the fact that over the past two years he's come to me and asked me to see a psychologist or psychiatrist or a therapist in order to help him overcome the problems that he developed while he wasn't with me. So if you ask me is he stable over there. I don't think so." J.M. added: "Why would he need a therapist if he's stable over there? So where does he come to get therapy? He comes to Sarasota."

J.M. concluded his testimony by asserting Joey "can't possibly say that he wants to move to the United States because [G.H.] has put so much psychological pressure on him he needed to see a counselor twice." J.M. stated he wanted to remove Joey from that cycle.

### D. Statements by Joey's counsel

Joey's counsel stated Joey did not want to move back to the United States because he did not like Sarasota and he was concerned about G.H.'s welfare. Joey told his counsel he was "way more comfortable in Israel." Counsel believed Joey "remain[ed] at risk" in terms of his mental health.

16

### E. The court's comments on the issues

The trial court repeatedly stated throughout the hearing that it believed Father showed a change of circumstance—G.H.'s violation of the 2012 judgment requiring her to communicate with Father through OFW, and G.H.'s poor co-parenting. But the court concluded J.M. did not meet his burden of showing that a change of circumstance indicated a different custody arrangement would be in Joey's best interest, based on the evidence presented in J.M.'s case.[5]

## IV. Trial Court's Order Denying J.M.'s Request to Modify Custody and Visitation and J.M.'s Request for Statement of Decision

On January 23, 2020, the trial court issued an order stating that, after conducting a three-day evidentiary hearing and considering the evidence and arguments presented, the court concluded J.M. "has not established that a change in custody is in the minor's best interests at this time for the reasons set forth on the record on January 22, 2020 [the final day of the evidentiary hearing]. As a result, Petitioner/Father's request for order is denied." The court's order also states: "This Court does reiterate the prior Court Order that Respondent/Mother is to check and use Our Family Wizard as the means of communication with Petitioner/Father pursuant to the terms and conditions of the prior Court Order. Respondent/Mother cannot simply choose which Court orders to comply with and which to ignore. Nor did

---

[5] We need not address whether J.M. demonstrated a significant change of circumstance within the meaning of the applicable law because we agree with the trial court's conclusion that J.M. did not demonstrate a different custody arrangement would be in Joey's best interest, as explained below.

17

her testimony on adverse direct establish a significant reason to justify not complying with the prior Court Order."

On January 31, 2020, J.M. requested a statement of decision, listing eight "principal controverted issues" he wanted the trial court to address. On February 7, 2020, the trial court denied J.M.'s request, explaining in its order that under existing law, a statement of decision is not required under the circumstances of this case—i.e., a ruling on a motion (request for order) after an evidentiary hearing.

J.M. timely appealed the orders on his request to modify custody and visitation. G.H. has not appeared in this appeal.

## DISCUSSION

### I. The Trial Court Did Not Err in Concluding the Evidentiary Hearing

J.M. contends the trial court deprived him of due process and a full and fair hearing when it terminated the evidentiary hearing during his case-in-chief, and the error is reversible per se. He asserts: "On January 22, 2020, while [he] was testifying, the Court directed him to step down from the witness stand and suddenly declared an end to the evidentiary hearing." We disagree with J.M.'s characterization of the record.

On the third and final day of the evidentiary hearing, while J.M. was testifying during his case-in-chief, the trial court and counsel for J.M. and G.H. engaged in a discussion on the record regarding the legal and factual issues in the case. J.M. interjected and stated, "I just want to finish my testimony, if I may." Addressing the court, J.M. added, "Because you asked me a question and I didn't get to finish it." The court allowed J.M. to complete his answer, and then the court commented on J.M.'s testimony. J.M. interjected again and stated, "I'm sorry. Just

18

one more comment to make because then I'm done because I don't know what else I can say." J.M. further testified, engaging in a dialogue with the trial court regarding the issues in the case.

During further discussion between the trial court and counsel for J.M., G.H., and Joey regarding the legal and factual issues in the case, the court stated to J.M.: "Hold on one second. [¶] Mr. M[.], why don't you step down. You can testify if you need to from there," presumably indicating counsel table. The discussion between the trial court and counsel continued.

After hearing arguments from J.M.'s and G.H.'s counsel, the trial court stated: "I need to look at the evidence one more time. The tentative is to deny for the reasons that I've stated on the record. But I'll issue a new ruling tomorrow. [¶] Does anyone have anything else they wish to say?" Counsel for J.M. and Joey made additional arguments, and the hearing concluded.

Based on the foregoing, we reject J.M.'s contention the trial court deprived him of due process and a full and fair hearing when it concluded the evidentiary hearing. When the court asked J.M. to step down from the witness stand—after J.M. had indicated he had nothing further to say—the court explained that J.M. could resume his testimony if need be. Neither J.M. nor his counsel ever informed the court they had additional evidence to present, including further testimony from J.M. Moreover, J.M. does not state on appeal what further evidence he could have presented.

In the one case cited by J.M. on this issue, *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, the Court of Appeal concluded the error was reversible per se where the trial court abruptly terminated the trial in a marital dissolution proceeding, ignoring the husband's statements that he not yet finished

presenting the evidence in his case.  (*Id*. at pp. 288-292.)  No such error occurred here, as the record before us demonstrates.

At oral argument, J.M.'s counsel raised another issue related to the manner in which the trial court conducted the evidentiary hearing, an issue J.M. did not raise in his appellate brief:  that the trial court requested that J.M. and G.H. set forth their respective "positions in a narrative fashion" during their testimony.  To the extent J.M. now takes issue with the trial court's request, he has forfeited the issue.  When the trial court made the request, J.M.'s counsel responded:  "Thank you, your honor.  I very much appreciate your candor and what you're looking for and I have no problem with Mr. M[.] so testifying [in a narrative fashion] toward the end of his testimony here today."  Counsel continued to examine J.M. and, at the conclusion of his testimony, J.M. set forth his position in a narrative fashion, as quoted above in the background section of this opinion.  Even if J.M. had preserved the issue for review by objecting below, the manner in which the trial court asked the parties to testify could not have prejudiced J.M. because (1) J.M.'s counsel had a full and fair opportunity to examine J.M. in the manner she chose, and (2) G.H. did not testify after the trial court asked the parties to set forth their positions in a narrative fashion because she did not present her case, as explained above.  (See *Silva v. Dias* (1941) 46 Cal.App.2d 662, 664 [a trial court's decision to allow a witness to testify in narrative form is "primarily addressed to the sound discretion of the trial court, and unless prejudice is shown, it can scarcely be said that such action amounted to an abuse of discretion"].)

**II.    The Trial Court Did Not Err in Denying J.M.'s Request for a Statement of Decision**

J.M. contends the trial court's denial of his request for a statement of decision "should be reversed" because it "deprived him of the ability to determine and understand the legal and factual bases of the Court's decision."[6]  For the reasons explained below, we disagree with this contention.

J.M. cites Code of Civil Procedure section 632, which provides in pertinent part:  "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required.  The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial."  He also cites Family Code section 3022.3, which applies Code of Civil Procedure section 632's requirements for issuance of a statement of decision to "the trial of a question of fact in a proceeding to determine the custody of a minor child."  (Fam. Code, § 3022.3.)

J.M. acknowledges, however, that courts have declined to require a statement of decision when requested by a party after a hearing on a motion or order to show cause (OSC).  "This is true even if the motion involves an evidentiary hearing and the order [granting or denying the motion or OSC] is appealable."  (*In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040 ["Since the proceeding on respondent's order to show cause [regarding spousal support and attorney fees in a marital dissolution

_____

[6] In his appellate brief, J.M. does not list the eight principal controverted issues he asked the trial court to address in his request for a statement of decision.  He discusses the absence of a statement of decision in more general terms.

21

proceeding] was not a trial and was not followed by a judgment, under the general rule, the trial court was not required to issue a statement of decision"].)[7]

J.M. also acknowledges there is no rule requiring a trial court to issue a statement of decision on a postjudgment request for an order modifying child custody or visitation.  (See *Anne H. v. Michael B.* (2016) 1 Cal.App.5th 488, 501, fn. 7 ["A statement of decision, however, is ordinarily available only after trial, not in connection with a ruling on a motion or special proceeding [citation], and Father cites no legal authority suggesting a statement of decision was available in connection with a motion to modify an existing custody order"].)  J.M. asks this court to create such a rule, arguing:  "When Family Code Section 217 applies and evidentiary hearings are held in post-Judgment family law child custody proceedings . . . , statements of decision should be issued when properly requested."  (Italics omitted.)  He asserts there are "significant public policy reasons" that favor such a rule, including that "child custody proceedings have priority over other issues in family law cases" and the "importance of child custody issues [has] been codified by our Legislature."

In support of his request for a new rule, J.M. cites a comment in a family law practice guide, stating, "it would appear the 'general rule' [that does not require a statement of decision] is not really appropriate" in "many family law motion/OSC hearings" where "the court's decision turns on factual findings." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter

---

[7] Before entering the 2012 judgment on custody and visitation in this matter, the trial court issued a 29-page statement of decision.

Group 2015) ¶ 15:129, p. 15-29, italics omitted.)  The comment continues, "it is quite arguable that the tide should now turn in favor of applying [Code of Civil Procedure section] 632 in connection with family law motion and OSC hearings because, with few exceptions, the family court 'shall receive' relevant live testimony offered by the parties at any Family Code OSC or motion hearing (Fam. [Code,] § 217); i.e., when [Family Code] § 217 applies, Family Code motion/OSC hearings are effectively conducted as 'mini-trials.' " (*Ibid.*, italics omitted.)  In its written order denying J.M.'s request for a statement of decision, the trial court cited this comment—as well as existing law holding a statement of decision is not required after an evidentiary hearing on a motion or OSC—and explained:  "While this Court understands the point made in the practice guide, and the request by [J.M.], this Court follows the existing law, which does not require a statement of decision under the circumstances."

We have no cause to reverse the trial court's order and create a new rule.

III.  **Family Code Section 3048 Is Inapplicable Because the Trial Court Did Not Issue a Custody or Visitation Order**

J.M. contends the trial court erred in failing to comply with Family Code section 3048, subdivision (a), which sets forth the information a trial court must include in "every custody or visitation order":  "(1)  The basis for the court's exercise of jurisdiction.  [¶]  (2)  The manner in which notice and opportunity to be heard were given.  [¶]  (3)  A clear description of the custody and visitation rights of each party.  [¶]  (4)  A provision stating that a violation of the order may subject the party in violation to civil or criminal penalties, or both.  [¶]  (5)  Identification of the

country of habitual residence of the child or children."  He argues we should reverse the order and remand the matter for the trial court to issue an order containing the information specified in Family Code section 3048, subdivision (a).

J.M. cites no authority indicating Family Code section 3048 is applicable in the present circumstances.  Here, the trial court denied J.M.'s request to modify the custody and visitation arrangement set forth in the 2012 judgment, leaving the existing arrangement in place.  The court did not issue a custody or visitation order.  Accordingly, Family Code section 3048 is inapplicable to the court's order denying J.M.'s request to modify custody and visitation, under the plain language of the statute stating it applies to a custody or visitation order, not a trial court's order declining to issue a new custody or visitation order.

## IV.    The Trial Court Did Not Abuse its Discretion in Denying J.M.'s Request to Modify Custody and Visitation

J.M. contends the trial court abused its discretion in denying his request to modify custody and visitation.  He argues: "No reasonable judge would have similarly conducted, concluded, and decided the post-Judgment trial in the manner [the trial court] did in this case," and the order "should be reversed."  The trial court did not abuse its discretion here, as explained below.

### A.    General legal principles applicable to modifications of custody and visitation

In "determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children," the "court's primary concern" is "the health, safety, and welfare of children."  (Fam. Code, § 3020, subd. (a).)  "Once the trial court has entered a final or permanent custody order

24

reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement.  [Citation.]  In recognition of this policy concern, [our Supreme Court has] articulated a variation on the best interest standard, known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination.  [Citations.]  Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest.  [Citation.]  Not only does this serve to protect the weighty interest in stable custody arrangements, but it also fosters judicial economy."  (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956.)

" 'The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test.' [Citation.]  Under this test, we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.' "  (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255; *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)  " ' "The reviewing court should interfere only ' "if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." ' " ' "  (*Rich v. Thatcher* (2011) 200 Cal.App.4th 1176, 1182.)

25

## B.    Analysis

We have no cause to disturb the trial court's denial of J.M.'s request to modify custody and visitation.  The trial court did not abuse its discretion in concluding that J.M. failed to prove a different custody arrangement would be in Joey's best interest.[8] Neither Dr. Quintal (J.M.'s chosen Florida-based therapist) nor Joey's counsel advocated to move Joey back to the United States. They both noted that the 2015 international move was very destabilizing and difficult for Joey; he had adjusted to his life in Israel and felt comfortable at his school; and he did not want to live in Florida.  Joey was not currently receiving mental health treatment and the evidence demonstrated he was stable.  He spoke up before when he wanted to go to therapy, and there was no reason to believe he would not do so again if he felt overwhelmed or depressed.  There is nothing unreasonable about the trial court's order.

In arguing the trial court abused its discretion in denying his request to modify custody and visitation, J.M. asserts the trial court "did not consider 'all evidence' available to it bearing on the issue of the child's best interests" because G.H. did not testify on direct examination, G.H. only conducted a brief cross-examination of Dr. Quintal, and Joey did not testify.  J.M. bore the burden of proving he was entitled to a modification of custody and visitation.  As discussed above, he had a full and fair opportunity to present his case.  He never stated there was additional evidence he wanted to present.  What evidence G.H.

---

[8] Because we reach this conclusion, we need not review the trial court's finding that J.M. established a change of circumstance.

26

might have presented in her case is irrelevant to whether he proved his case.

J.M. takes issue with comments the trial court made that it did not want to "punish" Joey or make him "pay" for Mother's poor co-parenting and her failure to use OFW, by moving him to Florida. When J.M. pointed out to the trial court that its comments offended him, the court acknowledged they were the wrong choice of words. The court explained it should not move Joey to a place he said he did not want to be (Florida) based on G.H.'s violations of the terms of the 2012 judgment, if J.M. had not demonstrated the move would be in Joey's best interest.

J.M. argues the trial court failed to consider the factors set forth in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*). There, our Supreme Court set forth "the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child" in a so-called move-away case. (*Id.* at p. 1101.) Here, neither parent was relocating (as G.H. was when the trial court issued the judgment in 2012), so *LaMusga* is inapplicable.

For the reasons set forth above, the trial court did not abuse its discretion in concluding J.M. failed to prove a different custody arrangement would be in Joey's best interest. Although J.M. presented evidence indicating there would be more rules and structure in his home, it was not unreasonable for the trial court to favor the stability of the current arrangement, in light of Joey's difficulty adjusting to the international move, his preference to remain in Israel at his current school, and the deleterious effect on his mental health when he becomes overwhelmed or stressed.

27

## DISPOSITION

The orders are affirmed.  J.M. is to bear his own costs on appeal.

NOT TO BE PUBLISHED

                                        CHANEY, J.

We concur:

ROTHSCHILD, P. J.

FEDERMAN, J.[*]

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.